## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE AGNC INVESTMENT CORP.[1] STOCKHOLDER DERIVATIVE LITIGATION | Master File No. 8:16-cv-03215-TDC |
| | (Consolidated with Case No. 8:16-cv-03310-TDC) |
| This Document Relates To:<br><br>ALL ACTIONS | VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW AND BREACH OF FIDUCIARY DUTY<br><br>DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      This is a consolidated stockholder derivative action brought by plaintiffs James Clem and William Wall ("Plaintiffs") on behalf of nominal defendant AGNC Investment Corp., formerly known as American Capital Agency Corp. ("AGNC" or the "Company"), against certain of AGNC's officers and directors for breaches of fiduciary duties and other violations of law, and against American Capital Asset Management, LLC ("ACAM") for aiding and abetting those breaches of fiduciary duty.  AGNC's conflicted Board of Directors (the "Board") and other wayward fiduciaries caused the Company to pay hundreds of millions of dollars in unfair fees to a related party and then to acquire that entity at a grossly excessive price.  In addition to tens of millions of dollars in direct pecuniary damages, AGNC's standing in the business community and reputation among investors has been severely damaged.

2.      AGNC is a real estate investment trust ("REIT") that primarily invests on a leveraged basis in agency mortgage-backed securities ("agency MBS").  As a REIT, AGNC is required by law to pay at least 90% of its profits as dividends.  According to the Company's annual filings with the U.S. Securities and Exchange Commission ("SEC"), AGNC's "principal

---

[1] Formerly known as American Capital Agency Corp.

objective is to preserve [its] net book value … while generating attractive risk-adjusted returns for distribution to [its] stockholders through regular monthly dividends."

3.      Until recently, the Company was externally managed by a related-party, AGNC Management, LLC ("AGNC Manager" or "Manager").  American Capital Ltd. ("American Capital") is the parent company of AGNC; AGNC Manager; another publicly-traded REIT called MTGE Investment Corp. ("MTGE"); MTGE Management, LLC ("MTGE Manager"); AGNC Mortgage Management, LLC ("ACMM"); defendant ACAM; and several other related parties.[2]  The following chart shows the structure of American Capital and its subsidiaries prior to May 23, 2016:



---

[2] Effective September 30, 2016, American Capital Agency Corp. changed its legal name to AGNC Investment Corp. (defined herein as "AGNC") and revised the names of certain subsidiaries and affiliates to remove references to American Capital.  MTGE was revised from American Capital Mortgage Investment Corp. to MTGE Investment Corp.; MTGE Manager was revised from American Capital MTGE Management, LLC to MTGE Management, LLC; and ACMM was revised from American Capital Mortgage Management, LLC to AGNC Mortgage Management, LLC (and now commonly referred to as "AMM").

4.      In advance of the various related companies' individual initial public offering ("IPO") dates, American Capital established the administrative service agreements for its companies.   Pursuant to these agreements, AGNC and various other companies have no dedicated employees of their own.   Rather, the related managers of each company (such as AGNC Manager) are responsible for the business activities and day-to-day operations of each company, and multiple officers and directors are shared between AGNC, AGNC Manager, and American Capital, among several other American Capital companies.   While AGNC Manager was responsible for administering AGNC's business activities and day-to-day operations, it was subject to the supervision and oversight of AGNC's Board, as noted in various AGNC Annual Reports.

5.      AGNC's Board, however, was hopelessly conflicted and failed to act in the best interests of AGNC and its stockholders and to protect the Company's assets.   AGNC and MTGE (another American Capital entity and publicly-traded REIT) both invest in mortgage-backed securities and are fundamentally competitors of one another.   Yet, at all relevant times, all of the members of AGNC's Board also simultaneously served as the entire board of directors of MTGE. Furthermore, AGNC Manager and MTGE Manager also employed four of the members of AGNC's Board.[3]   As members of the AGNC Board, the Individual Defendants (as defined herein) consciously disregarded the obvious conflicts of interest arising from these relationships and exploited their positions at these entities.   The Board caused AGNC to continue to pay excessive fees to its Manager despite years of poor investment performance and effectively subsidized MTGE's management at the expense of the best interests of AGNC and its stockholders.

---

[3] A fifth AGNC director sits on the board of ACSF, an American Capital-affiliated business development corporation where American Capital's founder and former CEO/Chairman currently serves as Chairman and CEO.

6.    AGNC's Board agreed year after year to force AGNC to pay its Manager exorbitant fees in excess of $100 million pursuant to the management agreement (the "AGNC Management Agreement" or "Management Agreement").   The fee structure in the AGNC Management Agreement provided virtually no incentive for AGNC Manager to fulfill the Company's stated primary objective of seeking investments that provide "attractive risk-adjusted returns for distribution to [its] stockholders through regular monthly dividends."   Rather, pursuant to the AGNC Management Agreement, the Company paid AGNC Manager a monthly fee equal to one-twelfth of 1.25% of AGNC's month-end stockholder's equity (with certain adjustments), *regardless of the performance of the investment portfolio*.

7.    The management fees paid by AGNC to its Manager were wholly unreasonable and well in excess of (i.e., more than twice) the actual costs of the services performed.   Worse, at the same time the Company was paying theses exorbitant fees, AGNC's performance was significantly deteriorating.   One of the key metrics for the Company's performance is its dividend.   Since 2012, the Board has slashed AGNC's dividend every year, and the dividend has decreased by more than 50%, from $5 per share per year to $2.16 per share per year (annualized to reflect the Company's most recent dividend of $0.18 per share).   The excessive fees were ultimately paid up the chain to the Individual Defendants, who held positions at related entities under the American Capital umbrella (e.g., ACAM, ACMM), rather than to AGNC stockholders in the form of dividends.   AGNC admits that it "did not have the benefit of arm's-length negotiations" in connection with its Management Agreement, and that "[t]he terms of the management agreement, including fees payable, may not reflect the terms that we may have received if it were negotiated with an unrelated third party."   Because they were the ultimate beneficiaries of these excessive fees, the members of AGNC's Board consciously disregarded their duty to renegotiate or cancel the AGNC Management Agreement.

8.      These excessive management fees paid by AGNC effectively subsidized the management of MTGE.  In light of the overlapping management, employee, and board oversight structures between AGNC and MTGE, the management services provided for the two entities were virtually identical.  But MTGE paid less than $20 million annually for essentially the same management services for which AGNC consistently paid more than $100 million.   While AGNC's annual management fees were more than double American Capital's cost to run the Manager, the annual management fees paid by MTGE represented just a fraction of the actual costs.  Without AGNC fronting the bill for the employees, officers, and members of the boards, MTGE's manager could not have continued its operations based solely on the amount of fees it collected on an annual basis from MTGE.  The fundamental conflicts of interest arising from this arrangement were obvious: AGNC (and its stockholders) had an interest in terminating or renegotiating its unfair Management Agreement, while MTGE had an interest in continuing to have AGNC bear the brunt of the cost of MTGE's management services.

9.      The Management Agreement was deemed to automatically renew each year for an additional one year period, unless the Company or AGNC Manager elected not to renew it.  If AGNC terminated the Management Agreement without cause, it would be required to pay AGNC Manager a penalty of three times the average annual management fee paid during the preceding two-year period (approximately $350 million).  But AGNC's Board had contractual rights in the Management Agreement that provided opportunities and leverage for AGNC to negotiate better terms (i.e., a more reasonable fee arrangement) with its Manager, and the fiduciary obligation to exercise those rights on behalf of AGNC and its stockholders.  If a majority of AGNC's putatively independent, non-management directors determined the fees were unfair, AGNC Manager would have to decide whether it would agree to adjust the fee and continue to manage AGNC at a fair priced determined by AGNC's Board, in which event the

Management Agreement would have remained in place at the reduced fee, and no termination penalty would have been triggered.  The Management Agreement also contemplated a procedure through which the Company and the Manager could agree to "[re]negotiate the Management Fee in good faith," also without triggering termination penalties.   Another provision of the Management Agreement required AGNC Manager, in the event of termination for any reason, to "cooperate with the Company in executing an orderly transition of the management of the Company's assets to a new manager," including if AGNC simply decided to manage its own operations without the assistance of an external manager.

10.      Given the unfair and excessive management fees AGNC was paying its Manager despite declining performance, and the fact that those fees were largely subsidizing MTGE's operations, it was incumbent on AGNC's Board, consistent with its fiduciary duties, to take advantage of these favorable provisions in the Management Agreement.  The Board could have forced its Manager to the table to renegotiate the agreement so that the management fee would at least be tied to AGNC's portfolio's performance, or to renegotiate the Termination Fee (as defined herein), which was based on an excessive management fee untethered to any results achieved.  But such a renegotiation of the terms or termination of the AGNC Management Agreement would have effectively severed MTGE's ability to continue functioning as a viable entity, creating a compelling interest on the part of MTGE to do everything in its power to maintain the status quo.  AGNC's Board members, who also made up the entirety of the MTGE board, consciously disregarded this blatant conflict of interest and repeatedly acted against AGNC's interests by approving the automatic renewals of the AGNC Management Agreement on the same unfair terms, year after year.  The members of AGNC's Board permitted AGNC to pay grossly excessive fees well in excess of $100 million annually, despite the abysmal

investment returns, and to continue to foot the bill for MTGE's management services, in violation of their fiduciary duty of loyalty to AGNC and its stockholders.

11.     AGNC's Board had another prime opportunity to renegotiate the terms of (or terminate) the Management Agreement in late 2015, when American Capital announced the strategic review of a possible sale of the parent company (and/or its various business lines). Under its terms, the Management Agreement would "terminate automatically without payment of the Termination Fee in the event of its assignment, in whole or in part, by the Manager, unless such assignment [was] consented to in writing by [AGNC] with the consent of a majority of the Independent Directors."  In the event American Capital wanted to include AGNC Manager and the valuable revenues the Manager collects from AGNC in any sale, American Capital would, in effect, need to get the approval of a majority of AGNC's independent directors.  Without that AGNC Board approval, the AGNC Management Agreement would terminate automatically without AGNC being required to pay the termination fee, and AGNC Manager would be virtually worthless in any sale.  This gave AGNC substantial leverage to negotiate more favorable and reasonable fee terms.

12.     The Board's conflicts of interest were amplified in March 2016, when AGNC Manager's President Gary Kain ("Kain") was appointed to the Board (and hired as the Company's Chief Executive Officer ("CEO")).  Defendant Kain (who retained his position as AGNC Manager's President) had an overriding personal interest in maintaining the status quo because he stood to lose his annual base salary of nearly $4.4 million (in addition to certain incentive compensation from the AGNC and MTGE Managers) in the event AGNC renegotiated its Management Agreement and forced MTGE to pay its fair share of management fees.  As a result, even stronger conflicting interests operated to block what, on the merits, should have been an easy decision to renegotiate or cancel the AGNC Management Agreement.

13.     Under pressure to address the fundamental disconnect between investment performance and the excessive management fee, AGNC's Board could and should have exercised their rights under the AGNC Management Agreement to renegotiate or cancel that agreement. Rather than act with undivided loyalty and pursue management alternatives that would serve the best interests of AGNC and its stockholders, however, AGNC's Board acted instead to protect the conflicting interests of AGNC Manager and MTGE.  After years of funneling hundreds of millions of dollars to AGNC Manager, on May 23, 2016, AGNC announced that it had entered into a definitive transaction, pursuant to which AGNC would acquire ACMM, the parent company of AGNC Manager, for a staggering $562 million in cash – more than $200 million more than AGNC would have paid had they simply terminated the Management Agreement – and become an internally-managed REIT (the "Internalization").

14.     The following chart shows the structure of AGNC and related entities following the Internalization:



15.     The Internalization grossly overvalues AGNC Manager because it is based on the value implied by the excessive fees AGNC paid to AGNC Manager over the last eight years. All of AGNC Manager's revenues – over $557 million in total fee revenues over those years – were generated from management fees paid by AGNC. The Board's estimate of the net economic benefit of the Internalization's elimination of AGNC Manager's fee confirms just how much AGNC had been overpaying for its services. According to a June 1, 2016 presentation filed by AGNC with the SEC, "AGNC expects the internalization transaction to provide a net economic benefit of approximately $80 million per year as a result of … [t]he elimination of its management fee…."

16.     In addition, even assuming AGNC was unsuccessful in renegotiating the terms of the Management Agreement through the multiple available options provided for in the agreement (which, as discussed above, the Board never even pursued), the Board could simply have terminated the Management Agreement and brought fund management in-house without paying the grossly excessive premium agreed to in the Internalization agreement. The June 1, 2016 presentation admitted that the expected $108 million in fees that were to be paid to AGNC Manager in 2016 could be internally "replaced by compensation and benefits expenses" of just $43 million.[4]  AGNC could have saved more than $200 million by simply terminating the Management Agreement and then bringing its management in-house for approximately $40 million annually. Several former Board members appear to have strongly disagreed with the Internalization – just one day before it was announced, five members of AGNC's then-current Board abruptly and unexpectedly resigned.

---

[4] This $43 million also appears to cover compensation and benefits expenses associated with the external management of another related party MTGE, so the projected cost to manage AGNC internally is actually lower than $43 million.

17.     AGNC's Board members also negligently made false and misleading statements in the Company's 2014-2016 Proxy Statements[5] in connection with their efforts to secure reelection to the Board.  While the 2014-2016 Proxy Statements acknowledged the penalty that AGNC would be forced to pay if it terminated the Management Agreement without cause, they failed to disclose and explain the favorable provisions in the Management Agreement that provided opportunities and leverage for AGNC to negotiate better terms with the Manager, without having to pay any termination penalty (as discussed above).  This led stockholders to believe that the Company was locked into the unfair Management Agreement with no alternative but to pay a large termination fee to get out of it.  The 2014-2016 Proxy Statements also failed to disclose and explain (i) the extent of AGNC's overpayment to its Manager – namely, that internal management of AGNC would have cost the Company less than half the amount the Company was paying its Manager; and (ii) that AGNC's management fees were also used to cover the external management of MTGE.  These facts were not disclosed and explained until the completion of the Internalization in June 2016.  The omission of these facts from the discussion of the Management Agreement further concealed the directors' failure to take action to protect AGNC's best interests.  Had AGNC's stockholders known this information, rather than simply having to rely on the Board's incomplete statements suggesting that the draconian Termination Fee was the only way out of the Management Agreement, stockholders would not have voted to reelect the faithless fiduciaries with conflicting loyalties.

18.     Plaintiff bring this action to recoup from the defendants the improper amounts that the Company paid AGNC Manager and the amount the Company overpaid to acquire it.

---

[5] The "2014-2016 Proxy Statements" refers collectively to the 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement (all as defined herein).

## JURISDICTION AND VENUE

19.     Pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. §1331 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act ("section 14(a)").  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  The other claims in this action are so related to the section 14(a) claims that fall within this Court's original jurisdiction that they form part of the same case or controversy under Article III, Section 2 of the United States Constitution.

20.     This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) AGNC maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AGNC, occurred in this District; and (iv) defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

23.     Plaintiff James Clem was a stockholder of AGNC at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AGNC stockholder.  Plaintiff Clem is a citizen of California.

24.     Plaintiff William Wall was a stockholder of AGNC at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AGNC stockholder.  Plaintiff Wall is a citizen of California.

**Nominal Defendant**

25.     Nominal Defendant AGNC is a Delaware-incorporated REIT, with principal executive offices at 2 Bethesda Metro Center, 12th Floor, Bethesda, Maryland.  Accordingly, AGNC is a citizen of Delaware and Maryland.  AGNC primarily earns income from investing in agency MBS, which consist of residential mortgage pass-through securities and collateralized mortgage obligations for which the principal and interest payments are guaranteed by a government-sponsored enterprise.  The Company also invests in other assets related to agency securities, and up to 10% in non-agency and commercial mortgage-backed securities.  AGNC's day-to-day operations were managed by AGNC Manager until July 1, 2016, at which point the Company completed its acquisition of AGNC Manager, effectively internalizing its management. The Company works in tandem with its sister company, MTGE, which is similarly managed by MTGE Manager.  Prior to the formation of a wholly owned captive broker-dealer subsidiary, Bethesda Securities, LLC ("BES"), in 2015, AGNC had no employees.  As of December 31, 2015, BES had three employees.

**Defendants**

26.     Defendant Kain is AGNC's CEO and a director and has been since March 2016; President and has been since April 2011; and Chief Investment Officer and has been since January 2009.  Defendant Kain was also AGNC's Senior Vice President from January 2009 to April 2011.  Defendant Kain is AGNC Manager's President and has been since April 2011.  Defendant Kain is the MTGE's CEO and a director and has been since March 2016; and President and Chief Investment Officer and has been since March 2011.  Defendant Kain is also MTGE Manager's President and has been since April 2011.  As a result of his positions as a director and/or officer of these entities, defendant Kain owes fiduciary duties to AGNC, AGNC Manager, MTGE, and MTGE Manager.  Defendant Kain is a citizen of Virginia.

27.     Defendant Peter J. Federico ("Federico") is AGNC's Chief Financial Officer ("CFO") and Executive Vice President and has been since July 2016.  Defendant Federico was also AGNC's Senior Vice President and Chief Risk Officer from June 2011 to July 2016.  Defendant Federico is AGNC Manager's Executive Vice President and Treasurer and has been since at least July 2016.  Defendant Federico is MTGE's Executive Vice President and CFO and has been since July 2016.  Defendant Federico was also MTGE's Senior Vice President and Chief Risk Officer from May 2011 to July 2016.  Defendant Federico is MTGE Manager's Executive Vice President and Treasurer and has been since at least July 2016.  Defendant Federico was also MTGE Manager's Senior Vice President and Chief Risk Officer from May 2011 to at least July 2016.  As a result of his positions as a director and/or officer of these entities, defendant Federico owes fiduciary duties to AGNC, AGNC Manager, MTGE, and MTGE Manager.  Defendant Federico is a citizen of Virginia.

28.     Defendant Prue B. Larocca ("Larocca") is AGNC's Lead Independent Director and has been since at least July 2016, Chairman of the Board and has been since May 2016, and

a director and has been since February 2013.  Defendant Larocca was also a MTGE director from February 2013 to May 2016.  Defendant Larocca is a member of the Audit and Compensation and Corporate Governance Committees and has been since at least March 2014. As a result of her positions as a director and/or officer of these entities, defendant Larocca owes a fiduciary duty to AGNC and owed a fiduciary duty to MTGE.  Defendant Larocca is a citizen of Washington, D.C.

29.     Defendant Morris A. Davis ("Davis") is an AGNC director and has been since at least May 2008.  Defendant Davis was also AGNC's Lead Independent Director from at least April 2010 to at least March 2013.  Defendant Davis was MTGE's Lead Independent Director and a director from at least March 2013 to May 2016.  Defendant Davis is the Chairman of the Compensation and Corporate Governance Committee and has been since at least July 2016, and a member of the Compensation and Corporate Governance Committee and has been since at least March 2009.  Defendant Davis is a member of the Audit Committee and has been since at least July 2016, and was previously a member of the Audit Committee from at least March 2009 to at least March 2013.  As a result of his positions as a director and/or officer of these entities, defendant Davis owes a fiduciary duty to AGNC and owed a fiduciary duty to MTGE. Defendant Davis is a citizen of New Jersey.

30.     Defendant Larry K. Harvey ("Harvey") is an AGNC director and has been since at least May 2008.  Defendant Harvey is an American Capital Senior Floating, Ltd. ("ACSF") director and has been since January 2014.  Defendant Harvey was a MTGE director from at least 2011 to May 2016.  Defendant Harvey is the Chairman of the Audit Committee and has been since at least March 2009.  Defendant Harvey is a member of the Compensation and Corporate Governance Committee and has been since at least July 2016, and was previously a member of the Compensation and Corporate Governance Committee from at least March 2009 to at least

March 2013.  As a result of his positions as a director and/or officer of these entities, defendant Harvey owes fiduciary duties to AGNC and ACSF and owed a fiduciary duty to MTGE. Defendant Harvey is a citizen of Virginia.

31.     Defendant Malon Wilkus ("Wilkus") was AGNC's CEO and Chairman of the Board and a director from January 2008 to March 2016.  Defendant Wilkus was also AGNC's President from January 2008 to April 2011.  Defendant Wilkus was AGNC Manager's CEO from April 2011 to March 2016.  Defendant Wilkus is the CEO of American Capital and has been since 1986 and Chairman and has been since 1998.  Defendant Wilkus was also American Capital's Chairman from 1986 to 1997 and Vice Chairman from 1997 to 1998.  Defendant Wilkus is the President of ACAM and has been since February 2011.  Defendant Wilkus was also the CEO of ACAM from February 2011 to March 2016.  Defendant Wilkus was also the CEO of ACMM from April 2011 to March 2016.  Defendant Wilkus is CEO of American Capital CLO Management, LLC and has been since July 2013.  Defendant Wilkus is the CEO of American Capital Leveraged Finance Management, LLC and has been since at least April 2016. Defendant Wilkus is CEO of ACSF Funding I, LLC and has been since at least April 2015. Defendant Wilkus was the CEO of ACAS Funding I, LLC and of ACAS Funding II, LLC in at least April 2015.  Defendant Wilkus is ACSF's Chairman and CEO, and a director and has been since February 2013.  Defendant Wilkus is the American Capital ACSF Management, LLC's (the "ACSF Manager") CEO and has been since February 2013.  Defendant Wilkus was MTGE's Chairman, a director, and CEO from March 2011 to March 2016.  Defendant Wilkus was also MTGE Manager's CEO from April 2011 to at least March 2016.  Defendant Wilkus is European Capital Limited's Chairman and a director and has been since least August 2005.  Defendant Wilkus is Chairman and a director of European Capital Asset Management Limited and has been since at least October 2013.  As a result of his positions as a director and/or officer of these

entities, defendant Wilkus owes fiduciary duties to American Capital, ACAM, ACLFM, and ACSF Manager, and owed a fiduciary duty to ACMM, AGNC Manager, MTGE Manager, AGNC, and MTGE.  Defendant Wilkus is a citizen of Maryland.

32.     Defendant John R. Erickson ("Erickson") was AGNC's CFO and Executive Vice President from January 2008 to July 2016; and a director from February 2013 to May 2016. Defendant Erickson was also AGNC Manager's Treasurer from April 2011 to at least July 2016; and Executive Vice President from July 2011 to at least July 2016.  Defendant Erickson is American Capital's CFO has been since February 1998 and President, Structured Finance and has been since July 2008.  Defendant Erickson was also American Capital's Executive Vice President from at least March 2001 to at least April 2008; Secretary from at least March 2000 to at least March 2004; and Vice President from at least 1998 to at least April 2000.  Defendant Erickson is the Executive Vice President and Treasurer of American Capital CLO Management, LLC and has been since at least April 2015.  Defendant Erickson is the Executive Vice President and Treasurer of ACSF Funding I, LLC and has been since at least April 2015.  Defendant Erickson is the Executive Vice President and Treasurer of American Capital Leveraged Finance Management, LLC and has been since at least April 2016.   Defendant Erickson was the Executive Vice President and Treasurer of ACAS Funding I, LLC and of ACAS Funding II, LLC in at least April 2015.  Defendant Erickson is also the Executive Vice President and Treasurer of ACAM and has been since February 2011.   Defendant Erickson is also the Executive Vice President and Treasurer of ACMM and has been since July 2011.  Defendant Erickson is ACSF's Executive Vice President, CFO, and Assistant Secretary and has been since February 2013.   Defendant Erickson is the ACSF Manager's Executive Vice President and Treasurer and has been since February 2013.  Defendant Erickson was MTGE's Executive Vice President and CFO from March 2011 to July 2016; and a director from at least March 2011 to

May 2016.  Defendant Erickson was also MTGE Manager's Executive Vice President from July 2011 to at least July 2016; and Treasurer from April 2011 to at least July 2016.  As a result of his positions as a director and/or officer of these entities, defendant Erickson owes fiduciary duties to American Capital, ACAM, ACMM, AGNC Manager, ACSF Manager, and ACSF and owed a fiduciary duty to MTGE Manager, AGNC, and MTGE.  Defendant Erickson is a citizen of Maryland.

33.     Defendant Samuel A. Flax ("Flax") was AGNC's Executive Vice President and Secretary from January 2008 to at least June 2016; and a director from July 2011 to May 2016. Defendant Flax was also AGNC Manager's Chief Compliance Officer from February 2012 to at least June 2016; Executive Vice President from July 2011 to at least June 2016; and Secretary from April 2011 to at least June 2016.  Defendant Flax is American Capital's Executive Vice President and General Counsel and has been since January 2005 and Chief Compliance Officer and Secretary and has been since at least March 2005.  Defendant Flax is also the Executive Vice President, Chief Compliance Officer, and Secretary of ACAM and has been since February 2011.  Defendant Flax was the Executive President, Chief Compliance Officer, and Secretary of ACMM and has been since at least 2011.  Defendant Flax is ACSF's Executive Vice President and Secretary and has been since February 2013 and Chief Compliance Officer and has been since July 2013.  Defendant Flax is also the ACSF Manager's Executive Vice President, Chief Compliance Officer, and Secretary and has been since February 2013.  Defendant Flax is the Executive Vice President, Chief Compliance Officer, and Secretary of American Capital CLO Management, LLC and has been since at least April 2015.  Defendant Flax is the Executive Vice President and Secretary of American Capital Leveraged Finance Management, LLC and has been since at least April 2016.  Defendant Flax is the Executive Vice President and Secretary of ACSF Funding I, LLC and has been since at least April 2015.  Defendant Flax was the Executive

Vice President and Secretary of ACAS Funding I, LLC and of ACAS Funding II, LLC in at least April 2015.  Defendant Flax was MTGE's Executive Vice President and Secretary from March 2011 to at least June 2016; and a director from February 2013 to May 2016.  Defendant Flax was also MTGE Manager's Chief Compliance Officer from February 2012 to at least June 2016; Executive Vice President from July 2011 to May 2016; and Secretary from April 2011 to at least June 2016.  Defendant Flax is a director of European Capital Asset Management Limited and has been since at least October 2013.  As a result of his positions as a director and/or officer of these entities, defendant Flax owes fiduciary duties to American Capital, ACAM, ACMM, ACLFM, ACSF Manager, and ACSF and owed a fiduciary duty to AGNC Manager, MTGE Manager, AGNC, and MTGE.  Defendant Flax is a citizen of Maryland.

34.     Defendant Robert M. Couch ("Couch") was AGNC's Lead Independent Director from at least March 2014 to at least March 2016, and a director from July 2011 to May 2016.  Defendant Couch was a member of the Audit Committee from at least March 2012 to at least March 2016.  Defendant Couch was a member of the Compensation and Corporate Governance Committee from at least March 2012 to at least March 2014.  Defendant Couch is a MTGE director and has been since at least August 2011.  As a result of his positions as a director and/or officer of these entities, defendant Couch owes a fiduciary duty to MTGE and owed a fiduciary duty to AGNC.  Defendant Couch is a citizen of Alabama.

35.     Defendant Randy E. Dobbs ("Dobbs") was an AGNC director from at least May 2008 to May 2016.  Defendant Dobbs was a member of the Audit Committee from at least March 2009 to at least March 2013.  Defendant Dobbs was Chairman of the Compensation and Corporate Governance Committee from at least March 2009 to May 2016.  Defendant Dobbs is MTGE's Chairman of the board and Lead Independent Director and has been since May 2016, and a director and has been since at least August 2011.  While in possession of material, non-

public information concerning AGNC's true business health, defendant Dobbs sold 4,500 shares of his stock for $86,301 in proceeds. As a result of his positions as a director and/or officer of these entities, defendant Dobbs owes a fiduciary duty to MTGE and owed a fiduciary duty to AGNC. Defendant Dobbs is a citizen of South Carolina.

36. Defendant Alvin N. Puryear ("Puryear") was an AGNC director from at least May 2008 to May 2016. Defendant Puryear is a director of American Capital and has been since at least September 1998. Defendant Puryear was the Chairman of the board of MTGE from March 2016 to May 2016; and a director of MTGE from at least August 2011 to May 2016. As a result of his positions as a director and/or officer of these entities, defendant Puryear owes a fiduciary duty to American Capital and owed fiduciary duties to AGNC and MTGE. Defendant Puryear is a citizen of Virginia.

37. Defendant ACAM is a Delaware limited liability company and is a wholly owned portfolio company of American Capital. Prior to the July 1, 2016 acquisition, defendant ACAM owned all of the issued and outstanding limited liability company interests in ACMM. On information and belief, defendant ACAM is a citizen of Delaware and Maryland.

38. Defendants Kain, Federico, Wilkus, Erickson, and Flax are referred to herein as the "Officer Defendants." Defendants Kain, Larocca, Davis, Harvey, Wilkus, Erickson, Flax, Couch, Dobbs, and Puryear are referred to herein as the "Director Defendants." Collectively, Defendants Kain, Federico, Larocca, Davis, Harvey, Wilkus, Flax, Couch, Dobbs, and Puryear are referred to herein as the "Individual Defendants."

**The Individual Defendants Have Pocketed Millions of Dollars Supporting American Capital and Its Entities**

39. As the following tables show, the Officer Defendants have made over $170 million through their various positions at American Capital related entities:

| Defendant | American Capital Entity | Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2015 | $1,085,000 | - | - | $3,000,000 | $7,950 | $4,092,950 |
| | | 2014 | $1,085,000 | - | - | $2,700,000 | $7,800 | $3,792,800 |
| | | 2013 | $1,085,000 | $226,446 | $1,262,967 | $2,700,000 | $7,650 | $5,282,063 |
| | | 2012 | $1,085,000 | - | $2,431,302 | $2,205,000 | $7,500 | $5,728,802 |
| | | 2011 | $1,085,000 | - | $4,377,098 | $1,950,000 | $7,350 | $7,419,448 |
| | | 2010 | $1,085,000 | - | $2,347,310 | $1,500,000 | $7,350 | $4,939,660 |
| | | 2009 | $1,085,000 | $236,817 | $1,335,533 | $1,500,000 | $7,350 | $4,164,700 |
| | | 2008 | $1,085,000 | $4,468,552 | $1,306,387 | $375,000 | $6,900 | $7,241,839 |
| | ACAS | | | | | | ACAS Total | $42,662,262 |
| John R. Erickson | | | | | | | Total | $42,662,262 |

| Defendant | American Capital Entity | Year | Salary | Total |
|---|---|---|---|---|
| | | 2016 | $800,000 | $800,000 |
| Peter J. Federico | AGNC | AGNC Total | | $800,000 |

| Defendant | American Capital Entity | Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2015 | $1,020,000 | - | - | $2,500,000 | $7,950 | $3,527,950 |
| | | 2014 | $1,020,000 | - | - | $2,250,000 | $7,800 | $3,277,800 |
| | | 2013 | $1,020,000 | $191,604 | $1,068,641 | $2,250,000 | $7,650 | $4,537,895 |
| | | 2012 | $1,020,000 | - | $2,057,211 | $1,837,500 | $7,500 | $4,922,211 |
| | | 2011 | $1,020,000 | - | $3,703,622 | $1,625,000 | $7,350 | $6,355,972 |
| | | 2010 | $1,020,000 | - | $1,986,144 | $1,250,000 | $7,350 | $4,263,494 |
| | | 2009 | $1,020,000 | $200,378 | $1,121,616 | $1,250,000 | $7,350 | $3,599,344 |
| | | 2008 | $1,020,000 | $3,384,845 | $894,652 | $312,500 | $6,900 | $5,618,897 |
| | ACAS | | | | | | | $36,103,563 |
| Samuel A. Flax | | | | | | | Total | $36,103,563 |

| Defendant | American Capital Entity | Year | Salary | Total |
|---|---|---|---|---|
| | | 2016 | $4,384,744 | $4,384,744 |
| Gary Kain | AGNC | AGNC Total | | $4,384,744 |

| Defendant | American Capital Entity | Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| | | 2015 | $1,495,000 | $6,731,560 | - | $3,000,000 | $7,950 | $11,234,510 |
| | | 2014 | $1,495,000 | $10,000,000 | - | $5,400,000 | $7,800 | $16,902,800 |
| | | 2013 | $1,495,000 | $400,630 | $2,234,448 | $5,400,000 | $7,650 | $9,537,728 |
| | | 2012 | $1,495,000 | - | $4,301,473 | $4,410,000 | $7,500 | $10,213,973 |
| | | 2011 | $1,495,000 | - | $7,743,984 | $3,900,000 | $7,350 | $13,146,334 |
| | | 2010 | $1,495,000 | - | $4,152,871 | $3,000,000 | $7,350 | $8,655,221 |
| | | 2009 | $1,495,000 | $418,975 | $2,526,089 | $3,000,000 | $7,350 | $7,447,414 |
| | | 2008 | $1,495,000 | $7,651,423 | $1,993,454 | $750,000 | $6,900 | $11,896,777 |
| | ACAS | | | | | | | $89,034,757 |
| Malon Wilkus | | | | | | | Total | $89,034,757 |

40.     Further, the Director Defendants have collectively pocketed nearly $10.5 million through their service at American Capital related entities:

| Defendant | American Capital Entity (Ticker) | Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|---|---|
| | | 2015 | $90,000 | $125,000 | $215,000 |
| | | 2014 | $70,000 | $75,000 | $145,000 |
| | | 2013 | $73,000 | $93,600 | $166,600 |
| | | 2012 | $68,500 | $88,440 | $156,940 |
| | | 2011 | $29,000 | $86,940 | $115,940 |
| | AGNC | | AGNC Total | | $799,480 |
| | | 2015 | $60,000 | $75,000 | $135,000 |
| | | 2014 | $60,000 | $75,000 | $135,000 |
| | | 2013 | $66,500 | $37,845 | $104,345 |
| | | 2012 | $62,500 | $29,505 | $ 92,005 |
| | | 2011 | $27,500 | $29,100 | $ 56,600 |
| Robert M. Couch | MTGE | | MTGE Total | | $522,950 |
| | | | | Total | $1,322,430 |

| Defendant | American Capital Entity (Ticker) | Year | Salary | Stock Awards | Total |
|---|---|---|---|---|---|
| | | 2015 | $80,000 | $125,000 | $205,000 |
| | | 2014 | $60,000 | $75,000 | $135,000 |
| | | 2013 | $68,000 | $93,600 | $161,600 |
| | | 2012 | $68,500 | $88,440 | $156,940 |
| | | 2011 | $67,000 | $87,210 | $154,210 |
| | | 2010 | $70,000 | $38,595 | $108,595 |
| | | 2009 | $65,500 | $35,700 | $101,200 |
| | | 2008 | $41,667 | $5,991 | $ 47,658 |
| | AGNC | | | AGNC Total | $1,070,203 |
| | | 2015 | $70,000 | $75,000 | $145,000 |
| | | 2014 | $70,000 | $75,000 | $145,000 |
| | | 2013 | $71,500 | $37,845 | $109,345 |
| | | 2012 | $62,500 | $29,505 | $ 92,005 |
| | | 2011 | $27,500 | $29,100 | $ 56,600 |
| | MTGE | | | MTGE Total | $547,950 |
| Morris A. Davis | | | | Total | $1,618,153 |

| Defendant | American Capital Entity (Ticker) | Year | Salary | Stock Awards | Total |
|---|---|---|---|---|---|
| | | 2015 | $90,000 | $125,000 | $215,000 |
| | | 2014 | $70,000 | $75,000 | $145,000 |
| | | 2013 | $75,500 | $93,600 | $169,100 |
| | | 2012 | $69,000 | $88,440 | $157,440 |
| | | 2011 | $72,000 | $87,210 | $159,210 |
| | | 2010 | $75,000 | $38,595 | $113,595 |
| | | 2009 | $70,500 | $35,700 | $106,200 |
| | | 2008 | $45,000 | $5,991 | $ 50,991 |
| | AGNC | | | AGNC Total | $1,116,536 |
| | | 2015 | $70,000 | $75,000 | $145,000 |
| | | 2014 | $70,000 | $75,000 | $145,000 |
| | | 2013 | $74,000 | $37,845 | $111,845 |
| | | 2012 | $66,250 | $29,505 | $ 95,755 |
| | | 2011 | $30,000 | $29,100 | $ 59,100 |
| | MTGE | | | MTGE Total | $556,700 |
| Randy E. Dobbs | | | | Total | $1,673,236 |

| Defendant | American Capital Entity (Ticker) | Year | Salary | Stock Awards | Total |
|---|---|---|---|---|---|
| | | 2015 | $100,000 | $125,000 | $225,000 |
| | | 2014 | $75,000 | $75,000 | $150,000 |
| | | 2013 | $84,500 | $93,600 | $178,100 |
| | | 2012 | $85,000 | $88,440 | $173,440 |
| | | 2011 | $88,000 | $87,210 | $175,210 |
| | | 2010 | $89,500 | $38,595 | $128,095 |
| | | 2009 | $82,000 | $35,700 | $117,700 |
| | | 2008 | $51,667 | $5,991 | $ 57,658 |
| | AGNC | | AGNC Total | | $1,205,203 |
| | | 2015 | $75,000 | $75,000 | $150,000 |
| | | 2014 | $75,000 | $75,000 | $150,000 |
| | | 2013 | $84,500 | $37,845 | $122,345 |
| | | 2012 | $79,000 | $29,505 | $108,505 |
| | | 2011 | $35,000 | $29,100 | $ 64,100 |
| | MTGE | | MTGE Total | | $594,950 |
| | | 2015 | $75,000 | - | $75,000 |
| | | 2014 | $75,000 | - | $75,000 |
| | ACSF | | ACSF Total | | $150,000 |
| Larry K. Harvey | | | Total | $1,950,153 | |

| Defendant | American Capital Entity (Ticker) | Year | Salary | Stock Awards | Total |
|---|---|---|---|---|---|
| | | 2015 | $80,000 | $125,000 | $205,000 |
| | | 2014 | $60,000 | $75,000 | $135,000 |
| | | 2013 | $54,167 | $93,600 | $147,767 |
| | AGNC | | | AGNC Total | $487,767 |
| | | 2015 | $60,000 | $75,000 | $135,000 |
| | | 2014 | $60,000 | $75,000 | $135,000 |
| | MTGE | 2013 | $54,167 | $37,845 | $ 92,012 |
| | | | | MTGE Total | $362,012 |
| Prue B. Larocca | | | | Total      $849,779 | |

| Defendant | Entity | Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| Alvin N. Puryear | | 2015 | $435,000 | - | - | $435,000 |
| | | 2014 | $417,500 | - | - | $417,500 |
| | | 2013 | $359,000 | - | - | $359,000 |
| | | 2012 | $349,500 | - | - | $349,500 |
| | | 2011 | $362,500 | - | - | $362,500 |
| | | 2010 | $339,500 | $236,680 | $50,000 | $339,500 |
| | | 2009 | $392,000 | $88,605 | - | $392,000 |
| | | 2008 | $399,667 | $132,196 | $361,393 | $399,667 |
| | ACAS | | | ACAS Total | | $3,054,667 |
| | | | | Total: | $3,054,667 | |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

41.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe AGNC and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to control and manage AGNC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AGNC and not in furtherance of their personal interest or benefit.

42.     To discharge their duties, the officers and directors of AGNC were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AGNC were required to, among other things:

(a)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)      remain informed as to how AGNC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

43.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of AGNC, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

44.      The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, AGNC to pay excessive management fees to AGNC Manager despite years of plummeting investment performance, and then to pay an excessive and entirely avoidable premium for the Internalization of AGNC Manager.

45.      Through their positions of control and authority as officers and/or directors of AGNC and other related entities in the American Capital family of entities, the Individual Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual

Defendants from taking such actions in breach of their fiduciary duties and/or in violation of the securities laws.  As a result, and in addition to the damage the Company has already incurred, AGNC has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did (i) deceive the investing public, including stockholders of AGNC, regarding the Individual Defendants' management of AGNC's operations; (ii) pay excessive management fees to AGNC Manager for years of plummeting performance; (iii) pay a grossly excessive amount to purchase AGNC Manager in connection with the Internalization; and (iv) enhance the Individual Defendants' executive and directorial positions at AGNC and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to overpay for AGNC Manager's services and then for AGNC Manager itself.

49.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty, and securities violations, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## AGNC'S AND MTGE'S CORPORATE BUSINESS STRUCTURES, OPERATIONS, AND EXTERNAL MANAGEMENT AGREEMENTS

52.     AGNC is a REIT that earns income primarily through investments in agency MBS.  As a REIT, AGNC is required by law to pay at least 90% of its profits as dividends. According to AGNC's 2014 Form 10-K the Company's "principal objective is to preserve [its] net book value … while generating attractive risk-adjusted returns for distribution to [its] stockholders through regular monthly dividends."

53.     American Capital was the parent company of AGNC and AGNC Manager. AGNC Manager and MTGE Manager were wholly-owned subsidiaries of ACMM, a wholly-owned subsidiary of ACAM, both of which ACMM and ACAM were wholly-owned by

American Capital. American Capital is also the parent of several other related parties, including ACMM, ACSF, the ACSF Manager, MTGE, and MTGE Manager.[6]

54.     On May 20, 2008, AGNC established an administrative service agreement with AGNC Manager, which was subsequently amended on July 29, 2011, and September 30, 2011. Pursuant to the AGNC Management Agreement, AGNC has no dedicated employees of its own. Rather, AGNC Manager is responsible for the business activities, day-to-day operations, and has access to the employees, infrastructure, business relationships, management expertise, information technologies, capital raising capabilities, legal compliance functions, accounting systems, treasury, and investor relations capabilities of both ACMM and American Capital.

55.     Similar to the AGNC Management Agreement, on August 9, 2011, MTGE entered into an external management agreement with MTGE Manager, which was later amended on September 30, 2011 (the "MTGE Management Agreement").

56.     As a result of these agreements with American Capital's various subsidiaries which led to a range of conflicts of interest, all of the officers of AGNC, ACSF, and MTGE are also officers of their respective managers, ACMM or American Capital.

57.     From 2008 and 2011 through July 1, 2016, AGNC and MTGE were externally managed by their respective managers, AGNC Manager and MTGE Manager.  As noted in various AGNC and MTGE Annual Reports, AGNC Manager and MTGE Manager were responsible for administering AGNC's and MTGE's business activities and day-to-day operations, subject to the supervision and oversight of AGNC's and MTGE's boards.

---

[6] Prior to July 1, 2016, AGNC and AGNC Manager were subsidiaries of ACMM, a subsidiary of American Capital, and were subsidiaries of American Capital.

### INTERNAL CONFLICTS ARISE AS A RESULT OF THE EXTERNAL MANAGEMENT AGREEMENTS

58.     AGNC and MTGE both invest in mortgage-backed securities and are fundamentally competitors of one another.  AGNC Manager and MTGE Manager provide fund management and administrative services to their respective clients, AGNC and MTGE, and to no other clients. AGNC and MTGE had no officers or employees of their own; their officers and employees were supplied by AGNC Manager and MTGE Manager, respectively.  As a result, the management agreements caused AGNC Manager and MTGE Manager to employ the same exact individuals.

59.     As well as having identical employees, the respective management agreements resulted in the same officers and/or members of the boards of directors of AGNC, ACSF, and MTGE and their respective managers, ACMM or American Capital.  Since at least MTGE's IPO in 2011, a majority of AGNC's directors also served as directors of MTGE.  From February 2013 until February 2016, the boards of AGNC and MTGE were identical.  Of the ten members of AGNC's Board during the relevant period, four also simultaneously served as executives of AGNC Manager and MTGE Manager, while an additional director (defendant Harvey) serves on the board of ACSF, an American Capital-affiliated business development corporation where American Capital founder defendant Wilkus serves as Chairman and CEO.[7]  The following table reflects AGNC's Board members' positions on the AGNC Board and MTGE board, and their overlapping executive positions with AGNC Manager and MTGE Manager, at various times leading up to the Internalization:

---

[7] The other Individual Defendant, defendant Frederico, served, at the same time he was an AGNC executive, as the Senior Vice President and Chief Risk Officer for both MTGE and MTGE Manager.  All of the Individual Defendants have ties to multiple American Capital controlled companies.  *See supra* ¶¶26-36.

| Defendant | AGNC | AGNC Manager | MTGE | MTGE Manager |
|---|---|---|---|---|
| Couch | Director | N/A | Director | N/A |
| Davis | Director | N/A | Lead Independent Director (Ended 3/16) Director (Ended 3/16) | N/A |
| Dobbs | Director | N/A | Director | N/A |
| Erickson | EVP Chief Financial Officer Director | EVP Treasurer | EVP Chief Financial Officer Director | EVP Treasurer |
| Flax | EVP Secretary Director | Chief Compliance Officer EVP Secretary | EVP Secretary Director | Chief Compliance Officer EVP Secretary |
| Harvey | Director | N/A | Director | N/A |
| Kain | Chief Executive Officer (Started 3/16) Director (Started 3/16) President Chief Investment Officer | President | Chief Executive Officer Director President Chief Investment Officer | President |
| Larocca | Chairman of the Board (Started 3/16) Director | N/A | Director | N/A |
| Puryear | Director | N/A | Chairman of the Board (3/16 - 5/16) Director | N/A |
| Wilkus | Chief Executive Officer (Ended 3/16) Chairman of the Board (Ended 3/16) Director (Ended 3/16) | Chief Executive Officer (Ended 3/16) | Chief Executive Officer Chairman of the Board Director | Chief Executive Officer |

60.     Despite the smaller size of MTGE's portfolio in comparison to AGNC's assets under management, the services provided to both AGNC and MTGE were identical, with limited exceptions.  However, as alleged herein, MTGE paid far less than AGNC for these essentially identical management services, and the fees collected by MTGE Manager for the services provided to MTGE were essentially funded and heavily dependent on the magnitude of AGNC's annual fee payments.  Without AGNC fronting the bill for the employees, officers, and members of the boards, MTGE Manager could not have continued its operations amounting to approximately $43 million per year when it only collected less than $20 million from MTGE annually.

**AGNC PAID ENORMOUS AND UNFAIR FEES TO ITS EXTERNAL MANAGER
DESPITE YEARS OF PLUMMETING PERFORMANCE**

61.     The AGNC Management Agreement's fee structure provided virtually no incentive for AGNC Manager to fulfill the Company's stated primary objective of seeking investments that provide "attractive risk-adjusted returns for distribution to [its] stockholders through regular monthly dividends."  Rather, pursuant to the AGNC Management Agreement, the Company paid AGNC Manager a monthly fee equal to one-twelfth of 1.25% of AGNC's month-end stockholder's equity (with certain adjustments), ***regardless of the performance of the investment portfolio.***[8]

62.     AGNC Manager collected well over $100 million per year in fees, totaling nearly half a billion dollars over the course of four years.  Specifically, AGNC paid its Manager $116 million, $119 million, $136 million, and $113 million in 2015, 2014, 2013, and 2012, respectively.  In comparison, MTGE paid $17.2 million, $17.6 million, $18.7 million, and $9.6 million in management fees to MTGE Manager in those same fiscal years.  The disproportionate difference in fee payments between AGNC and MTGE, and the fact that virtually the same management services were being provided to both AGNC and MTGE, makes clear that AGNC was funding the costs of nearly all of the services and employees provided to run the daily operations of MTGE.

63.     In addition to subsidizing the management of MTGE's portfolio, AGNC paid fees well in excess of $100 million annually despite the fact that its performance deteriorated substantially over the last five years.  From the third quarter of 2012 through the end of 2015, AGNC's stock price fell steadily, and the dividends paid to stockholders were repeatedly slashed. As detailed in the following graphs, from the third quarter of 2012 through the last quarter of

---

[8] The MTGE Management Agreement similarly provided that MTGE would pay a monthly fee equal to one-twelfth of 1.5% of its month-end stockholders' equity (with certain adjustments), regardless of performance.

2015, AGNC's stock price decreased by almost half, from an average of $34.65 to an average of $18.16, while the Company's quarterly dividend payouts decreased by over 52%, from $1.25 per quarter to a mere $0.60 per quarter.  The fees paid to AGNC Manager held steady, however, causing AGNC to pay higher and higher fees relative to performance:





64.     Net asset value suffered, as well.  On February 1, 2016, the Company announced that for the full year 2015, AGNC suffered an economic loss of -2.6%, and a decline in book value of $0.41 per share:



65.     In August 2016, AGNC again slashed its dividends, this time to an effective payout of just $0.54 per quarter.  Despite these disastrous results, in the first half of 2016 alone, AGNC paid fees to AGNC Manager totaling approximately $52 million, equating to $104 million on an annualized basis.

**AGNC FAILED TO TERMINATE OR RENEGOTIATE THE AGNC MANAGEMENT
AGREEMENT IN THE BEST INTEREST OF STOCKHOLDERS WHEN IT HAD THE
OPPORTUNITY TO DO SO**

66.     The AGNC Management Agreement was deemed to automatically renew each year for an additional one-year period, unless the Company or AGNC Manager elected not to renew it.  The Management Agreement gave the Board the right to cancel the agreement upon

180 days' written notice to AGNC Manager.[9]  Given that the entirety of AGNC's day-to-day operations were administered and overseen by AGNC Manager, the Board's primary role was to review the Management Agreement, ensure that its terms were in the Company's best interests, and take all necessary actions to effectuate changes to the agreement (and/or AGNC's management structure) where warranted.

67.     If AGNC terminated the Management Agreement without cause, it would be required to pay AGNC Manager a penalty of three times the average annual management fee paid during the preceding two-year period (the "Termination Fee").  If, for example, AGNC chose to terminate its Management Agreement prior to the Internalization in July 2016, AGNC would have paid a termination fee of approximately $350 million.  However, the AGNC Management Agreement provided mechanisms that would permit AGNC to negotiate potential amendments to the terms of the Management Agreement and avoid paying termination penalties, if the Board determined at any point that the management fees were unfair.

68.     Section 10(d) of the AGNC Management Agreement provided that if the Board notified AGNC Manager that a majority of the putatively independent, non-management directors[10] determined the fees were unfair, AGNC Manager would be forced to decide whether to agree to adjust the fee and continue to manage AGNC at a fair priced determined by AGNC's

---

[9] In addition, pursuant to its Charter, AGNC's Compensation and Corporate Governance Committee reviews: (i) the Company's goals and objectives with respect to the Management Agreement, and to amend, or recommend that the Board amend these goals and objectives if the Committee deems it appropriate; (ii) the compensation and fees paid to the Manager under the Management Agreement to determine whether the compensation and fees paid are in accordance with the terms of the Management Agreement and to report the Committee's determination to the Board; and (iii) the performance of the Manager in light of the Company's goals and objectives and to make recommendations to the Board as to the appropriate compensation under the Management Agreement with respect to any renewal terms (or with respect to any new management agreement).

[10] As alleged herein, none of these directors were independent with respect to AGNC's Manager or the Management Agreement given their dual roles as directors on AGNC's Board and MTGE's board.

Board.  In this event, the Management Agreement would have remained in place at the reduced fee, and no termination penalty would have been triggered.

69.    Section 10(d) also provided a procedure through which the Company and the Manager could agree to "[re]negotiate the Management Fee in good faith," without triggering termination penalties.  Specifically, section 10(d) stated:

> (d) *Unfair Manager Compensation*. Notwithstanding the provisions of subsection (c) above, if the reason for nonrenewal specified in the Company's Termination Notice is that a majority of the Independent Directors have determined that the Management Fee payable to the Manager is unfair, the Company shall not have the foregoing nonrenewal right in the event the Manager agrees that it will continue to perform its duties hereunder during the Automatic Renewal Term that would commence upon the expiration of the Initial Term or then current Automatic Renewal Term at a fee that the majority of the Independent Directors determine to be fair; *provided, however*, the Manager shall have the right to renegotiate the Management Fee by delivering to the Company, not less than 120 days prior to the pending Effective Termination Date, written notice (a "*Notice of Proposal to Negotiate*") of its intention to renegotiate the Management Fee. Thereupon, the Company and the Manager shall endeavor to negotiate the Management Fee in good faith. Provided that the Company and the Manager agree to a revised Management Fee or other compensation structure within sixty (60) days following the Company's receipt of the Notice of Proposal to Negotiate, the Termination Notice from the Company shall be deemed of no force and effect, and this Agreement shall continue in full force and effect on the terms stated herein, except that the Management Fee or other compensation structure shall be the revised Management Fee or other compensation structure then agreed upon by the Company and the Manager. The Company and the Manager agree to execute and deliver an amendment to this Agreement setting forth such revised Management Fee or other compensation structure promptly upon reaching an agreement regarding same. In the event that the Company and the Manager are unable to agree to a revised Management Fee or other compensation structure during such sixty (60) day period, this Agreement shall terminate on the Effective Termination Date and the Company shall be obligated to pay the Manager the Termination Fee upon the Effective Termination Date.

70.    In addition, section 10(c) of the AGNC Management Agreement (and the MTGE Management Agreement) required the Manager to "cooperate with the Company in executing an orderly transition of the management of the Company's assets to a new manager," whether or not the Management Agreement was terminated by AGNC with or without cause.  Section 10(c)

would apply in the event that AGNC (or MTGE) decided to terminate the Management Agreement and manage its own operations without the assistance of an external manager.

71.    Rather than exercise its contractual right to force AGNC Manager to come to the table regarding a fair fee, the Board determined, year after year, in the face of steadily declining investment performance, to continue to authorize AGNC to pay its Manager increasingly exorbitant fees, and to subsidize MTGE's management fees.  AGNC paid $116 million, $119 million, $136 million, and $113 million in 2015, 2014, 2013, and 2012, whereas MTGE paid $17.2 million, $17.6 million, $19.7 million, and $9.6 million in the same fiscal years.  Despite AGNC's deteriorating performance, AGNC paid management fees equating to approximately 80% of the Company's annual operating expenses over the past five years.  The Board – whose members also comprised the MTGE board – failed to take advantage of sections 10(c) and 10(d) of the Management Agreement and never attempted to renegotiate any of the terms to ensure that AGNC was paying reasonable and fair management fees and not subsidizing MTGE's management at the expense of AGNC and its stockholders.

72.    For example, the Board could have utilized section 10(d) to renegotiate the fee structure so that the management fee would be tied to AGNC's portfolio's performance in order to ensure that AGNC was getting the benefit of the bargain and not paying excessive fees.  The Board also could have sought to renegotiate the Termination Fee, which was based on a three-times multiple of the average annual management fee paid during the preceding twenty-four (24) months.  In the face of management fees that were way out of line with the Company's performance and actual management costs, and that were effectively subsidizing a competitor REIT, the Board had an unremitting duty to act to protect the Company's assets and interests.  But due to their conflicting duties to MTGE and their interest in maintaining their positions with other American Capital entities, the Board members repeatedly approved the renewal of the

Management Agreement and took none of the actions available to them under the agreement to ensure that AGNC was paying fair and reasonable management fees.

73.     Whether AGNC's Board tried to renegotiate the terms of the Management Agreement, or opted to terminate the agreement and used a fraction of the more than $100 million annual fees paid to AGNC Manager to hire employees to manage the Company's assets internally, the Company would have been able to pay significantly less in management fees for the same or substantially similar services.  However, because MTGE's operations were heavily subsidized by AGNC's payments to AGNC Manager, MTGE had a strong interest in ensuring that the AGNC Management Agreement remained intact on the same terms so that MTGE could continue its free ride for management services.  In fact, MTGE explained in its 2015 Form 10-K that it may not "enforce, or to enforce less vigorously, our rights under the management agreement because of our desire to maintain our ongoing relationship with our Manager" (which, as discussed above, provides virtually identical services by the same employees as AGNC Manager).  The termination of the AGNC Management Agreement would risk severing MTGE's ability to continue functioning as a viable entity.  As a result, AGNC's Board (who also represented the entire MTGE board) put the interests of MTGE and AGNC Manager ahead of the Company's interests and repeatedly approved the Management Agreement without exercising any of its rights to make a better deal, ensuring that AGNC remained shackled to the unfair terms of the then-existing Management Agreement.

74.     AGNC has effectively admitted that its negotiations in connection with its Management Agreement were not conducted at arm's-length and may not reflect fair and reasonable terms that could have been negotiated with an outside party.  According to its 2015 Form 10-K:

> The [M]anagement [A]greement was originally negotiated between related parties, and ***we did not have the benefit of arm's-length negotiations*** of the type

normally conducted with an unaffiliated third party. *The terms of the management agreement, including fees payable, may not reflect the terms that we may have received if it were negotiated with an unrelated third party*.

75.     The begrudging disclosure of this fact did not absolve the Individual Defendants of their fiduciary duty of loyalty to put AGNC's and its stockholders' interests first in connection with all dealings between the Company and AGNC Manager, and to fully and forthrightly disclose the Board's decisions to not exercise the Company's rights under the Management Agreement to ensure the fees being paid by the Company were fair.

### AFTER FAILING TO TERMINATE OR RENGOTIATE THE AGNC MANAGEMENT AGREEMENT, INTERNAL CONFLICTS AMONG BOARD MEMBERS LEAD TO INTERNALIZATION OF MANAGEMENT

76.     On November 19, 2015, target activist investor Elliott Management Corp. ("Elliott"), representing an 8.4% interest in American Capital, began a proxy campaign urging stockholders to oppose the plan to spin off Business Development Company ("BDC") assets. Specifically, Elliott opposed American Capital's poor capital deployment, excessive overhead expenses, lack of board expertise and poor compensation performance, which it believed put valuable assets at risk, served to entrench management, and significantly limited options for future stockholder value creation. Ultimately, Elliott called upon American Capital to withdraw the spin-out proposal, add new directors, perform a strategic review, assess its portfolio and capital allocation, and cut overhead expenses.

77.     On November 25, 2015, American Capital, the parent company of AGNC and AGNC Manager, issued a press release announcing that although it touted a 16% annualized growth rate in both book value and per share over the five years ending September 30, 2015, it would undertake "a full strategic review of all alternatives with Goldman Sachs & Co. and Credit Suisse Securities (USA) LLC as its financial advisors to assist in [the] review" in order to maximize stockholder value. Following the announcement of the strategic review, on January 7,

2016, American Capital announced in a press release that the initial phase of the strategic review process had been completed and an "independent" committee had "authorized [American Capital] to proceed with the solicitation of offers to purchase [American Capital] or its various business lines in whole or in part."

78.     As the founder of American Capital, defendant Wilkus had a personal financial interest in the package sale of American Capital as a whole, including all of its subsidiaries.  AGNC's exercise of a strategic alternative, such as terminating AGNC Manager and hiring a third-party, liquidating assets, or internalizing AGNC Manager, would significantly impair defendant Wilkus' financial interests, as he stood to lose from any reduction in the sale price.  Absent the option of a package sale of American Capital, the next best strategic alternative for defendant Wilkus was to internalize AGNC Manager to keep management fees in an entity in which defendant Wilkus would benefit from financially, as opposed to paying a third-party manager.  The Internalization (as discussed below) resulted in a $562 million payment to ACAM, an entity which employed conflicted defendants Wilkus, Erickson, and Flax as executives.

79.     Given the existence of certain favorable terms in the AGNC Management Agreement, this represented a perfect opportunity for AGNC to renegotiate the terms of its Management Agreement to ensure that the Company paid a fair management fee going forward, and to get out from underneath the financial dependency of MTGE.  Specifically, section 11 of the AGNC Management Agreement provided that the agreement would "terminate automatically without payment of the Termination Fee in the event of its assignment, in whole or in part, by the Manager, unless such assignment [was] consented to in writing by [AGNC] with the consent of a majority of the Independent Directors."  In the event American Capital wanted to include AGNC Manager and the valuable revenues the Manager collected from AGNC in any sale, American

Capital would, in effect, need to get the approval of a majority of AGNC's independent directors. Without that AGNC Board approval, the AGNC Management Agreement would terminate automatically without AGNC being required to pay the Termination Fee, and AGNC Manager would be virtually worthless in any sale. The potential sale of American Capital gave AGNC substantial leverage to negotiate more favorable and reasonable fee terms. But the conflicted AGNC Board again put the interests of its members, MTGE, and AGNC Manager ahead of the Company's best interests by again approving the renewal of the Management Agreement and permitting AGNC to continue paying excessive management fees, despite known, readily available means for ensuring that the Company was paying fair management fees.

80.     Although section 3 of the AGNC Management Agreement provided that in the event of a termination of the AGNC Management Agreement without cause, AGNC was barred from "employ[ing]  or otherwise retain[ing] any employee of the Manager or any of its Affiliates (including American Capital)" for two years from the date of the termination, a termination based on the assignment of the Manager would not include any such restrictions. In the event the Management Agreement was terminated because of a sale by American Capital (or other assignment), AGNC would be able to hire the Manager's (or American Capital's or any of its affiliates') employees to provide in-house management services at a fraction of the cost AGNC had been paying its external Manager.

81.     According to the October 18, 2016 proxy statement filed by American Capital in connection with its proposed acquisition by Ares Capital Corporation, "Jones Day [] advised American Capital telephonically that it had been engaged as legal advisor to the independent directors of AGNC and MTGE in connection with American Capital's strategic review process and the potential implications for AGNC and MTGE with respect thereto." But despite the assistance of both Jones Day and J.P. Morgan, the debilitating conflicts of interest arising from

the Board members' overlapping roles as directors and officers of AGNC, MTGE, and AGNC Manager ensured that the Board would continue to give AGNC's best interests short shrift. The Board did not take advantage of multiple strategic alternatives to ensure that AGNC's management fees were fair and, as discussed below, ultimately took actions that cost the Company even more.

### AGNC'S BOARD, LED BY THE MANAGER'S PRESIDENT AND NEW AGNC CEO/DIRECTOR, AGREES TO PURCHASE AGNC MANAGER FOR AN EXORBITANT PRICE

82.     On March 17, 2016, AGNC's Board compounded the conflicts of interest afflicting it and further ensured that the Company's Management Agreement would not be renegotiated or terminated by appointing defendant Kain, the long-time President of both AGNC Manager and MTGE Manager, to succeed defendant Wilkus as AGNC's CEO. Unbeknownst to AGNC stockholders, defendant Kain had a direct financial stake in maintaining the status quo: Kain stood to lose his annual base salary of nearly $4.4 million, as well as incentive compensation from AGNC Manager and MTGE Manager, in the event the Management Agreement was terminated. If the Manager were no longer managing AGNC and MTGE (in particular, AGNC), then the Manager would no longer have any source of revenue. In turn, defendant Kain would likely be out of a job and lose his greater than $4 million in annual compensation from the Manager. Defendant Kain had an undeniable interest in pursuing actions as AGNC's CEO that would benefit, or minimize potential harm to, AGNC Manager. In addition, notwithstanding defendant Kain's new obligations to AGNC, Kain continued to maintain his position as President of AGNC Manager (as well as continuing to serve as MTGE's CEO, director, and President and Chief Investment Officer), creating direct conflicts of interest with respect to the management fee issue and any proposed re-alignment or disposition of AGNC

Manager, and diminishing any possibility that the fee would be renegotiated or the AGNC's relationship with AGNC Manager terminated.

83.     As expected following the appointment of defendant Kain as CEO, AGNC's Board took affirmative action to serve the interests of AGNC's Manager at the expense of the Company's best interests.  Rather than pursue other strategic options in light of the conflicts of interest between the entities, on May 23, 2016, AGNC announced that it had agreed to the Internalization, wherein the Company would acquire AGNC and become an internally-managed REIT.  The Internalization was completed on July 1, 2016, for a staggering $562 million in cash – more than $200 million more than AGNC would have paid had the Company simply terminated the Management Agreement.

84.     The Internalization grossly overvalues AGNC Manager.  All of AGNC Manager's revenues – over $557 million in total fee revenues over the last eight years –were generated from management fees paid by AGNC, which AGNC has effectively admitted grossly overcompensated AGNC Manager.  In a June 1, 2016 presentation filed by AGNC with the SEC, AGNC confirmed that the payments made to AGNC Manager were excessive, noting that "AGNC expects the internalization transaction to provide a net economic benefit of approximately $80 million per year as a result of … [t]he elimination of its management fee….":



85.     The June 1, 2016 presentation further admitted that the expected $108 million in fees that were to be paid to AGNC Manager in 2016 could be internally "replaced by compensation and benefits expenses" of just $43 million.  In other words, AGNC could have saved more than $200 million by simply terminating the Management agreement and then bringing its management in-house for approximately $40 million annually.  Significantly, that $43 million also appears to cover compensation and benefits expenses associated with the external management of another related party MTGE, so projected cost to manage AGNC internally is actually lower than $43 million.  Tellingly, to date AGNC has refused to disclose any valuation methods that were used to support the $562 million purchase.  Regardless, the only way the Internalization could be depicted as benefitting AGNC is by ignoring the far less costly strategic alternatives available to the Board under the AGNC Management Agreement and pretending that AGNC Manager's excessive fees were somehow unavoidable absent Internalization on the agreed terms.

86.     It appears that several former Board members were vehemently opposed to the Internalization.  The day before the transaction was announced, five of the nine members of AGNC's Board abruptly and unexpectedly resigned effective immediately.  The Company has refused to provide any explanation for these resignations, but the timing of their simultaneous resignations makes clear that these Board members were either forced out or resigned over concerns over the pricing of the Internalization.

### DEFENDANTS ISSUE FALSE AND MISLEADING STATEMENTS IN AND OMIT MATERIAL FACTS FROM AGNC'S 2014-2016 PROXY STATEMENTS

87.     Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders in AGNC's 2014-2016 Proxy Statements. Plaintiffs' allegations with respect to the misleading statements in the 2014-2016 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

2014 Proxy Statement

88.     On March 12, 2014, defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus caused AGNC to issue a proxy statement in connection with the 2014 Annual Stockholders meeting, held on April 22, 2014 (the "2014 Proxy Statement").  In the 2014 Proxy Statement, defendants solicited stockholder votes to reelect themselves to the Board.

89.     The 2014 Proxy Statement represented the following regarding the AGNC Management Agreement and AGNC's options for terminating the agreement and/or renegotiating more favorable terms:

The initial term of the management agreement expired on May 20, 2011. The management agreement automatically renews for additional one-year terms thereafter unless it is terminated either by us for cause with 60 days prior written notice, or in connection with the expiration of the initial term or such renewal term, by us or our Manager without cause with 180 days prior written notice. Any nonrenewal by us must be approved by a majority of our independent directors. *Additionally, if we decide to not renew the management agreement without cause, we must pay a termination fee on the last day of the applicable term, equal to three times the average annual management fee earned by our Manager during the prior 24-month period immediately preceding the most recently completed month prior to the effective date of termination.* In addition, we may not, without the consent of our Manager, employ any employee of the Manager or any of its affiliates, including American Capital, or any person who has been employed by our Manager or any of its affiliates at any time within the two year period immediately preceding the date on which the person commences employment with us for two years after such termination of the management agreement. As of the date of this proxy statement, no such termination notice has been given in connection with the expiration of the initial or subsequent term.

90.    While the 2014 Proxy Statement acknowledged the termination penalty that AGNC would be forced to pay if it terminated the Management Agreement without cause, the 2014 Proxy Statement failed to disclose and explain favorable provisions in the Management Agreement that provided alternative options and afforded additional leverage to AGNC to negotiate better terms (i.e., a more reasonable fee arrangement) with the Manager.  Specifically, section 10(d) of the AGNC Management Agreement provided that if the Board notified AGNC Manager that a majority of the independent directors determined the fees were unfair, AGNC Manager could simply accept the fee AGNC's Board determined to be fair.  In that event, the Management Agreement would have remained in place at the reduced fee and without any penalty.  In addition, section 10(d) outlined a process by which the Company and the Manager could agree to "[re]negotiate the Management Fee in good faith," which also would avoid triggering a termination penalty.

91.    The 2014 Proxy Statement, as issued and without providing the full context relating to AGNC's options for negotiating fairer terms in its Management Agreement, created the clear impression for stockholders that the Company was locked into the unfair Management

Agreement with no alternative but to pay the approximately $350 million termination fee if the Company wanted to pay a fair management fee moving forward.  In its 2014 Form 10-K, AGNC reported cash and cash equivalents of $1.7 billion.  This gave the impression to AGNC stockholders that 20% of the Company's cash would have to be spent on a termination fee in order for the Company to obtain more favorable management fee terms, when, in fact, other avenues were available to AGNC to potentially renegotiate a more reasonable management fee without any termination penalty.

92.     In discussing the Management Agreement, the 2014 Proxy Statement also failed to disclose and explain (i) the true extent of AGNC's overpayment to its Manager – namely, that the internal management of AGNC would have cost the Company less than half the amount the Company was paying its Manager; and (ii) that AGNC's management fees were also used to cover the external management of MTGE.  These facts were not disclosed or explained until the completion of the Internalization on June 1, 2016, in a presentation revealing that AGNC Manager could be internally "replaced by compensation and benefits expenses" of just $43 million, which also covered compensation and benefits expenses associated with the external management of MTGE.  The omission of these facts from the discussion of the Management Agreement further concealed the directors' failure to take action to protect AGNC's best interests.

93.     The 2014 Proxy Statement harmed AGNC by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of defendants' misleading statements in the 2014 Proxy Statement, AGNC's stockholders voted to reelect defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus to AGNC's Board, without the benefit of material information regarding (i) these defendants' continued and ongoing failure to explore and take available steps to renegotiate the terms of the unfair Management Agreement and endeavor to ensure a fair

management fee without any termination penalty; (ii) the extent of the excessive management fees being paid by AGNC relative to the cost of the services provided; and (iii) the fact that the result of those director failures was that AGNC was effectively subsidizing MTGE's management. The failure to fully disclose and explain the options the Board had to negotiate lower management fees or cancel the agreement, in addition to the stated termination fee, made the discussion about the management agreement misleading.  If the stockholders knew this information, rather than the affirmative statements the Board members made that gave the impression that the draconian Termination Fee was the only way out of the agreement, stockholders would not have voted for these faithless fiduciaries with conflicting loyalties.

<u>2015 Proxy Statement</u>

94.     On March 11, 2015, defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus caused AGNC to issue a proxy statement in connection with the 2015 Annual Stockholders meeting, held on April 21, 2015 (the "2015 Proxy Statement").  In the 2015 Proxy Statement, defendants solicited stockholder votes to reelect themselves to the Board.

95.     The 2015 Proxy Statement represented the following regarding the AGNC Management Agreement and AGNC's options for terminating the agreement and/or renegotiating more favorable terms:

> The initial term of the management agreement expired on May 20, 2011. The management agreement automatically renews for additional one-year terms thereafter unless it is terminated either by us for cause with 60 days prior written notice, or in connection with the expiration of any renewal term, by us or our Manager without cause with 180 days prior written notice. Any nonrenewal by us must be approved by a majority of our independent directors. ***Additionally, if we decide to not renew the management agreement without cause, we must pay a termination fee on the last day of the applicable term, equal to three times the average annual management fee earned by our Manager during the prior 24-month period immediately preceding the most recently completed month prior to the effective date of termination***. In addition, we may not, without the consent of our Manager, employ any employee of the Manager or any of its affiliates, including American Capital, or any person who has been employed by our Manager or any of its affiliates at any time within the two year period

immediately preceding the date on which the person commences employment with us for two years after such termination of the management agreement. As of the date of this proxy statement, no such termination notice has been given in connection with the expiration of the initial or subsequent term.

96.     While the 2015 Proxy Statement acknowledged the termination penalty that AGNC would be forced to pay if it terminated the Management Agreement without cause, the 2015 Proxy Statement failed to disclose and explain favorable provisions in the Management Agreement that provided alternative options and afforded additional leverage to AGNC to negotiate better terms (i.e., a more reasonable fee arrangement) with the Manager.  Specifically, section 10(d) of the AGNC Management Agreement provided that if the Board notified AGNC Manager that a majority of the independent directors determined the fees were unfair, AGNC Manager could simply accept the fee AGNC's Board determined to be fair.  In that event, the Management Agreement would have remained in place at the reduced fee and without any penalty.  In addition, section 10(d) outlined a process by which the Company and the Manager could agree to "[re]negotiate the Management Fee in good faith," which also would avoid triggering a termination penalty.

97.     The 2015 Proxy Statement, as issued and without providing the full context relating to AGNC's options for negotiating fairer terms in its Management Agreement, created the clear impression for stockholders that the Company was locked into the unfair Management Agreement with no alternative but to pay the approximately $350 million termination fee if the Company wanted to pay a fair management fee moving forward.  In its 2014 Form 10-K, AGNC reported cash and cash equivalents of $1.7 billion, as of December 31, 2014.  This gave the impression to AGNC stockholders that approximately 20% of the Company's cash would have to be spent on a termination fee in order for the Company to obtain more favorable management fee terms, when, in fact, other avenues were available to AGNC to potentially renegotiate a more reasonable management fee without any termination penalty.

98.     In discussing the Management Agreement, the 2015 Proxy Statement also failed to disclose and explain (i) the true extent of AGNC's overpayment to its Manager – namely, that internal management of AGNC would have cost the Company less than half the amount the Company was paying its Manager; and (ii) that AGNC's management fees were also used to cover the external management of MTGE.   These facts were not disclosed and explained until the completion of the Internalization on June 1, 2016, in a presentation revealing that AGNC Manager could be internally "replaced by compensation and benefits expenses" of just $43 million, which also covered compensation and benefits expenses associated with the external management of MTGE.   The omission of these facts from the discussion of the Management Agreement further concealed the directors' failure to take action to protect AGNC's best interests.

99.     The 2015 Proxy Statement harmed AGNC by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.   As a result of defendants' misleading statements in the 2015 Proxy Statement, AGNC's stockholders voted to reelect defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus to AGNC's Board, without the benefit of material information regarding (i) these defendants' continued and ongoing failure to explore and take available steps to renegotiate the terms of the unfair Management Agreement and endeavor to ensure a fair management fee without any termination penalty; (ii) the extent of the excessive management fees being paid by AGNC relative to the cost of the services provided; and (iii) the fact that the result of those director failures was that AGNC was effectively subsidizing MTGE's management. The failure to fully disclose and explain the options the Board had to negotiate lower management fees or cancel the agreement, in addition to the stated termination fee, made the discussion about the Management Agreement misleading.   If the stockholders knew this information, rather than the affirmative statements the Board members made that gave the

impression that the draconian Termination Fee was the only way out of the agreement, stockholders would not have voted for these faithless fiduciaries with conflicting loyalties.

<u>2016 Proxy Statement</u>

100.    On March 11, 2016, defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus caused AGNC to issue a Proxy Statement in connection with the 2016 Annual Stockholders meeting, held on April 19, 2016 (the "2016 Proxy Statement").  In the 2016 Proxy Statement, defendants solicited stockholder votes to reelect themselves to the Board.

101.    The 2016 Proxy Statement represented the following regarding the AGNC Management Agreement and AGNC's options for terminating the agreement and/or renegotiating more favorable terms:

> The management agreement automatically renews for additional one-year terms thereafter unless it is terminated either by us for cause with 60 days prior written notice, or in connection with the expiration of any renewal term, by us or our Manager without cause with 180 days prior written notice. Any nonrenewal by us must be approved by a majority of our independent directors. ***Additionally, if we decide to not renew the management agreement without cause, we must pay a termination fee on the last day of the applicable term, equal to three times the average annual management fee earned by our Manager during the prior 24-month period immediately preceding the most recently completed month prior to the effective date of termination***. In addition, we may not, without the consent of our Manager, employ any employee of the Manager or any of its affiliates, including American Capital, or any person who has been employed by our Manager or any of its affiliates at any time within the two year period immediately preceding the date on which the person commences employment with us for two years after such termination of the management agreement. As of the date of this proxy statement, no such termination notice has been given in connection with the expiration of the initial or subsequent term.

102.    While the 2016 Proxy Statement acknowledged the termination penalty that AGNC would be forced to pay if it terminated the Management Agreement without cause, the 2016 Proxy Statement failed to disclose and explain favorable provisions in the Management Agreement that provided alternative options and afforded additional leverage to AGNC to negotiate better terms (i.e., a more reasonable fee arrangement) with the Manager.  Specifically, section 10(d) of the AGNC Management Agreement provided that if the Board notified AGNC

Manager that a majority of the independent directors determined the fees were unfair, AGNC Manager could simply accept the fee AGNC's Board determined to be fair.  In that event, the Management Agreement would have remained in place at the reduced fee and without any penalty.  In addition, Section 10(d) outlined a process by which the Company and the Manager could agree to "[re]negotiate the Management Fee in good faith," which also would avoid triggering a termination penalty.

103.    In discussing the Management Agreement, the 2016 Proxy Statement also failed to disclose and explain another available opportunity for AGNC to use additional leverage to renegotiate the terms of the Management Agreement and ensure a fair management fee moving forward.  Section 11 of the AGNC Management Agreement provided that the agreement would "terminate automatically without payment of the Termination Fee in the event of its assignment, in whole or in part, by the Manager, unless such assignment [was] consented to in writing by [AGNC] with the consent of a majority of the Independent Directors."  Beginning in November 2015 and continuing into 2016, American Capital was undertaking a "full strategic review of all alternatives" to maximize stockholder value, which included the potential sale of the company or its various business lines (in whole or in part).  Pursuant to section 11 of the Management Agreement, in the event of the assignment of the AGNC Management Agreement through a potential sale, AGNC would be able to get out of the agreement without paying a termination penalty so long as a majority of AGNC's "independent" directors did not consent to the assignment.  This provided AGNC additional leverage to negotiate terms that should have been more favorable and in the best interest of AGNC stockholders.  The 2016 Proxy Statement makes no mention of this despite public announcements about potential sales and/or other corporate actions that could result in the assignment of the Management Agreement and give AGNC a way to get out of the unfair agreement without any termination penalty.

104.    The 2016 Proxy Statement, as issued and without providing the full context relating to AGNC's options for negotiating fairer terms in its Management Agreement, created the clear impression for stockholders that the Company was locked into the unfair Management Agreement with no alternative but to pay the approximately $350 million termination fee if the Company wanted to pay a fair management fee moving forward.  In its 2015 Form 10-K, AGNC reported cash and cash equivalents of $1.1 billion, as of December 31, 2015.  This gave the impression to AGNC stockholders that approximately 32% of the Company's cash would have to be spent on a termination fee in order for the Company to obtain more favorable management fee terms, when, in fact, other avenues were available to AGNC to potentially renegotiate a more reasonable management fee without any termination penalty.

105.    In discussing the Management Agreement, the 2016 Proxy Statement also failed to disclose and explain (i) the true extent of AGNC's overpayment to its Manager – namely, that internal management of AGNC would have cost the Company less than half the amount the Company was paying its Manager; and (ii) that AGNC's management fees were also used to cover the external management of MTGE.  These facts were not disclosed or explained until the completion of the Internalization on June 1, 2016, in a presentation revealing that AGNC Manager could be internally "replaced by compensation and benefits expenses" of just $43 million, which also covered compensation and benefits expenses associated with the external management of MTGE.  The omission of these facts from the discussion of the Management Agreement further concealed the directors' failure to take action to protect AGNC's best interests.

106.    The 2016 Proxy Statement harmed AGNC by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of defendants' misleading statements in the 2016 Proxy Statement, AGNC's stockholders voted to reelect defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey,

Larocca, Puryear, and Wilkus to AGNC's Board, without the benefit of material information regarding (i) these defendants' continued and ongoing failure to explore and take available steps to renegotiate the terms of the unfair Management Agreement and endeavor to ensure a fair management fee without any termination penalty; (ii) the extent of the excessive management fees being paid by AGNC relative to the cost of the services provided; and (iii) the fact that the result of those director failures was that AGNC was effectively subsidizing MTGE's management. The failure to fully disclose and the options the Board had to negotiate lower management fees or cancel the agreement, in addition to the stated termination fee, made the discussion about the Management Agreement misleading.  If the stockholders knew this information, rather than the affirmative statements the Board members made that gave the impression that the draconian Termination Fee was the only way out of the agreement, stockholders would not have voted for these faithless fiduciaries with conflicting loyalties.

## DAMAGES TO AGNC

107.     As a result of the Individual Defendants' improprieties, for years AGNC paid over $100 million per year in excessive fees to AGNC Manager in exchange for services that the Company has admitted were worth less than $50 million per year.  Further, the Individual Defendants caused or allowed AGNC to enter into the Internalization for more than half a billion dollars, which valued AGNC Manager based largely on the excessive fees that it received from AGNC, which the Company has admitted were overvalued by as much as 250%.

108.     AGNC's gross overpayment of management fees also damaged its reputation within the business community and in the capital markets.  In addition to price, AGNC's current and potential investors consider a REIT's ability to keep costs reasonable and fair.  Investors are less likely to invest in REITs that mismanage or otherwise squander investment money.  AGNC's ability to attract investors is now impaired.  In addition, the Company stands to incur higher

marginal costs of capital and debt because the perceived risks of investing in and lending money to the Company.

109.     Further, as a direct and proximate result of the Individual Defendants' actions, AGNC has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to, costs incurred from compensation and benefits paid to the defendants who have breached their duties to AGNC.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

110.     Plaintiffs bring this action derivatively in the right and for the benefit of AGNC to redress injuries suffered, and to be suffered, by AGNC as a direct result of violations of law, and breaches of fiduciary duty as well as the aiding and abetting thereof, by the Individual Defendants.   AGNC is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.     Plaintiffs will adequately and fairly represent the interests of AGNC in enforcing and prosecuting its rights.

112.     Plaintiffs were stockholders of AGNC at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current AGNC stockholders.

113.     At time this action was commenced, the Board of AGNC consisted of the following four individuals: defendants Kain, Larocca, Davis, and Harvey.   Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### Demand on Defendant Kain Is Excused

114.     Demand on defendant Kain is excused with respect to the Internalization because, as President of AGNC Manager and CEO and a director of AGNC, he stood on both sides of the transaction and received a benefit not shared by the rest of the Company's stockholders.

Defendant Kain's interests were directly contrary to AGNC's and its stockholders' interests: he benefitted handsomely from the Internalization (by being able to continue in his management role at AGNC Manager), while the Company and its stockholders were subjected to further unnecessary and excessive expenditures of corporate funds that could have been avoided by the actions of an independent and diligent Board.

115.     In addition, the Internalization was not a valid exercise of business judgment.   As discussed herein, the Internalization grossly overvalues AGNC Manager because all of AGNC Manager's revenues were generated from fees paid by AGNC.   AGNC has effectively admitted that the Company grossly overpaid for such management services: "AGNC expects the internalization transaction to provide a net economic benefit of approximately $80 million per year as a result of … [t]he elimination of its management fee …." Had defendant Kain and his fellow Board members simply exercised their right to cancel the AGNC Management Agreement, AGNC could have simply brought their management in-house without the grossly wasteful Internalization.   These self-serving actions are not valid exercises of business judgment. Defendant Kain also faces a substantial likelihood of liability for his role in the Internalization for the same reasons.

116.     Demand is also futile because defendant Kain lacks independence from fellow director defendants Davis, Harvey, and Larocca (each of whom is interested for the reasons outlined below).   Defendant Kain is now AGNC's CEO, is set to make nearly $4.4 million in base salary and is eligible for equity compensation of up to $5,400,000.   Defendants Davis, Harvey, and Larocca, who comprise AGNC's Compensation Committee and a majority of the AGNC Board, may fire defendant Kain and futher "oversee and review the compensation practices of the Company with regard to the Chief Executive Offer."   Defendants Davis, Harvey, and Larocca therefore have the ability to affect Kain's compensation going forward even in the

event they did not choose to terminate him from his position as CEO of AGNC.  There is, therefore, reason to doubt defendant Kain's independence in connection with a demand to investigate and/or pursue litigation against defendants Davis, Harvey, and Larocca.

**Demand on Defendants Larocca, Davis, and Harvey Is Excused**

<u>Management Agreement and Fees</u>

117.    Demand on defendants Larocca, Davis, and Harvey is futile because their renewals of the AGNC Management Agreement and conscious failure to take action to terminate or renegotiate the terms of the AGNC Management Agreement in the Company's best interests were not valid exercises of business judgment.  These defendants, together with their fellow Board members, caused and/or permitted AGNC to pay its Manager fees in excess of $100 million annually based on a fee structure that provided virtually no incentive for AGNC Manager to fulfill the Company's stated primary objective of seeking investments that provide "attractive risk-adjusted returns for distribution to [its] stockholders through regular monthly dividends" and calculate fees irrespective of the performance of the investment portfolio.  As AGNC has admitted, the management fees paid by AGNC to its Manager were more than twice the actual costs of the services performed and were paid while AGNC's performance was significantly deteriorating and dividends to stockholders were being drastically and consistently slashed.

118.    In addition to serving on AGNC's Board, defendants Larocca, Davis, and Harvey also served on the board of directors of MTGE, a separate American Capital REIT that was a competitor of AGNC.  As a result, these conflicting duties to AGNC and MTGE.  Defendants Larocca, Davis, and Harvey were well aware that although the management services being provided to the entities were virtually identical, MTGE paid less than $20 million annually in management fees, and that while AGNC's annual management fees were more than double American Capital's cost to run AGNC Manager, the annual management fees paid by MTGE

represented just a fraction of the actual costs.  These defendants were also well aware that, as a result, AGNC was effectively subsidizing MTGE's management, and that absent that arrangement, MTGE's manager could not have continued its operations for the amount of fees it collected on an annual basis solely from MTGE.  While AGNC's (and its stockholders') overriding interest was in terminating or renegotiating its unfair management agreement, MTGE had the opposite interest: maintaining the status quo (i.e., AGNC footing the bill for MTGE's management services).

119.   AGNC's Board had contractual rights and other avenues for either terminating the AGNC Management Agreement as unfair or forcing AGNC Manager to charge fair fees, either of which would have resulted in AGNC paying far lower fees than the Company had been paying AGNC Manager for years.  Such Board action, however, would have effectively severed MTGE's ability to continue functioning as a viable entity.  Defendants Larocca, Davis, and Harvey, together with their former fellow directors, repeatedly permitted the AGNC Management Agreement to remain in place on the same unfair terms, effectively ensuring that the Company continued to pay grossly excessive fees well in excess of $100 million annually despite the Company's abysmal results, and continued to foot the bill for MTGE's management services.  These decisions were not valid exercises of business judgment.  Defendants Larocca, Davis, and Harvey also face a substantial likelihood of liability for the same reasons.

<u>Internalization</u>

120.   Demand on defendants Larocca, Davis, and Harvey is futile for the additional reason that the Internalization they approved as members of the Board was not a valid exercise of business judgment.   As discussed herein, the Internalization grossly overvalues AGNC Manager because all of AGNC Manager's revenues were generated from fees paid by AGNC.   AGNC has effectively admitted that the Company grossly overpaid for such management services: "AGNC

expects the internalization transaction to provide a net economic benefit of approximately $80 million per year as a result of … [t]he elimination of its management fee…." Had these defendants and their fellow Board members simply exercised their right to cancel the AGNC Management Agreement, AGNC could have simply brought its management in-house without the grossly wasteful Internalization.  This self-serving use of corporate assets is not a valid business judgment.  Defendants Larocca, Davis, and Harvey also face a substantial likelihood of liability for their role in the Internalization for the same reasons.

False and Misleading Proxy Statements

121.    Defendants Larocca, Davis, and Harvey also face a substantial likelihood of liability for negligently causing and/or permitting false and misleading statements in AGNC's 2014-2016 Proxy Statements.

122.    The 2014-2016 Proxy Statements failed to disclose and explain the favorable provisions in the Management Agreement that provided alternative options and afforded additional leverage to AGNC to negotiate better terms with the Manager.  The incomplete and misleading proxy statements suggested to stockholders that the Company was stuck with the unfair Management Agreement and had no way out other than to pay a huge termination fee, but the truth was that AGNC had specific contractual rights that enabled it to attempt to renegotiate a more reasonable management fee without any termination penalty.  The 2014-2016 Proxy Statements also failed to disclose and explain the true extent of AGNC's overpayment to its Manager – the Company was paying the Manager more than twice the cost of the management services – and that AGNC's management fees were being used to subsidize MTGE's management.  Stockholders voted to elect the directors based on this incomplete and misleading information.

123.     Defendants Larocca, Davis, and Harvey face a substantial likelihood of liability for violations of section 14(a) of the Exchange Act for negligently causing AGNC to issue the false and misleading 2014-2016 Proxy Statements, and for breaching their duty of candor. Demand on these defendants is futile.

Independence

124.     Defendants Larocca, Davis, and Harvey will not vote to initiate litigation against the remaining Individual Defendants because of their ties to American Capital.  As detailed above, the Individual Defendants all have ties to American Capital or an affiliate.  American Capital has, in turn, placed defendants Larocca, Davis, and Harvey on multiple American Capital controlled companies.  In particular, in addition to AGNC, defendants Larocca, Davis, and Harvey are all on the board of MTGE.  Pursuant to these positions, defendants Larocca, Davis, and Harvey receive hundreds of thousands of dollars in additional compensation.  To initiate litigation against American Capital's employees risks not just their current Board positions, but board positions at the other American Capital, related entities and all future entities that American Capital is routinely creating.  Defendant Harvey especially lacks independence given, in addition to the boards of AGNC and MTGE, he has sat and continues to sit on the board of ACSF, where defendant Wilkus remains Chairman and CEO.  Accordingly, defendants Larocca, Davis, and Harvey will not vote to initiate litigation because they are currently beholden to American Capital and will not risk future positions appointed by American Capital.

125.     Plaintiffs have not made any demand on the other stockholders of AGNC to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     AGNC is a publicly held company with over 331 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force Plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus for Violation of Section 14(a) of the Exchange Act**

126.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

127.     The section 14(a) claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus**.**  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

128.     Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in AGNC's 2014-2016 Proxy Statements.  The 2014-2016 Proxy Statements contained proposals to AGNC's stockholders that they vote to reelect the members of the Board.  The 2014-2016 Proxy Statements, however, misrepresented and failed to disclose and explain: (i) the favorable provisions in the Management Agreement that provided opportunities and leverage for AGNC to negotiate better terms with the Manager, without having to pay any termination penalty, leading stockholders to believe that the Company was locked into the unfair Management Agreement

with no alternative but to pay a large termination fee to get out of it; (ii) the extent of the excessive management fees being paid by AGNC relative to the cost of the services provided; and (iii) that AGNC was effectively subsidizing MTGE's management.

129.     By reasons of the conduct alleged herein, defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus violated section 14(a) of the Exchange Act.   As a direct and proximate result of these defendants' wrongful conduct, AGNC misled and/or deceived its stockholders by making false and misleading statements that were an essential link in stockholders heeding AGNC's recommendation to elect defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus.

130.     The false and misleading information contained in the 2014-2016 Proxy Statements was material to AGNC's stockholders in determining whether or not to elect defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus. This information was also material to the integrity of the directors that were proposed for election to the Board.   The proxy solicitation process in connection with the 2014-2016 Proxy Statements was an essential link in the election of nominees to the Board.

131.     Plaintiffs, on behalf of AGNC, thereby seek relief for damages inflicted upon the Company in connection with the improper election of defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus based upon the false and misleading 2014-2016 Proxy Statements, and also seek new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

132.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

133.     The Individual Defendants owed and owe AGNC fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe AGNC the highest obligation of good faith, fair dealing, loyalty, and due care.

134.     The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that AGNC was grossly overpaying management fees to a related-party, AGNC Manager, for years.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

135.     The Officer Defendants also breached their duty of loyalty by causing and/or permitting AGNC to enter into the Internalization agreement, which resulted in the overpayment of corporate funds to acquire AGNC Manager.

136.     The Director Defendants, as directors of the Company, owed AGNC the highest duty of loyalty.  These defendants breached their duty of loyalty by: (a) repeatedly approving the renewal of the Management Agreement on its existing terms, despite the existence of available options to renegotiate the terms of the agreement or terminate the agreement, any of which would have saved the Company money; (b) approving the Internalization, which resulted in the gross overpayment of corporate funds to acquire AGNC Manager; and (c) assuming and retaining positions outside of their roles as AGNC Board members that created conflicting duties, particularly with respect to the AGNC Management Agreement and the management fees paid by AGNC.

137.     The Director Defendants also breached their duties of candor and loyalty by causing and/or permitting AGNC to issue the 2014-2016 Proxy Statements, which misrepresented and omitted material information.   Accordingly, the Director Defendants breached their duty of loyalty to the Company.

138.     As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, AGNC has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

139.    Plaintiffs, on behalf of AGNC, have no adequate remedy at law.

## COUNT III

**Against Defendant ACAM for Aiding and Abetting Breach of Fiduciary Duty**

140.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as fully set forth herein.

141.    Defendant ACAM knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Internalization, which, without such aid, would not have occurred.  Particularly, ACAM participated in and was vital in the Company overpaying for its own internal manager.

142.    As a direct and proximate result of defendant ACAM's aiding and abetting the Individual Defendants' breaches of fiduciary obligations, the Company has sustained, and will continue to sustain, irreparable harm for which there is no adequate remedy at law

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of AGNC, demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of law and breaches of fiduciary duties;

B.    Determining that the Individual Defendants have violated their fiduciary duties to the Company;

C.    Directing AGNC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AGNC and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

       1.      a proposal to strengthen the Company's controls over dealings with related parties;

       2.      a proposal to strengthen the Company's controls over conflicts management and portfolio management fees and costs;

       3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

       4.      a provision to permit the stockholders of AGNC to nominate at least three candidates for election to the Board; and

       5.      a proposal to strengthen AGNC's oversight of its operations and portfolio performance;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of AGNC have an effective remedy;

E.      Awarding to AGNC restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: December 23, 2016

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS (*pro hac vice*)
CRAIG W. SMITH (*pro hac vice*)
SHANE P. SANDERS (*pro hac vice*)

/s/ Shane P. Sanders
_____

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        ssanders@robbinsarroyo.com

*Lead Counsel for Plaintiffs*

**CUNEO GILBERT & LADUCA, LLP**
JONATHAN W. CUNEO
CHARLES J. LADUCA
MATTHEW E. MILLER (#19220)
BRENDAN S. THOMPSON (#18695)
4725 Wisconsin Avenue, NW, Suite 200
Washington, D.C. 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
E-mail: jonc@cuneolaw.com
        charlesl@cuneolaw.com
        mmiller@cuneolaw.com
        brendant@cuneolaw.com

*Liaison Counsel for Plaintiffs*

<u>VERIFICATION</u>

I, James Clem, hereby declare as follows:

I am one of the plaintiffs in the within entitled action.  I have read the Verified Stockholder Consolidated Derivative Complaint for Violation of the Federal Securities Law, Breach of Fiduciary Duty, and Waste of Corporate Assets.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 12-22-2016

JAMES CLEM

VERIFICATION

I, William Wall, hereby declare as follows:

I am one of the plaintiffs in the within entitled action.   I have read the Verified Stockholder Consolidated Derivative Complaint for Violation of the Federal Securities Law, Breach of Fiduciary Duty, and Waste of Corporate Assets.   Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____12/18/16_____

_____
WILLIAM WALL

**CERTIFICATE OF SERVICE**

I certify that counsel for all parties were served through the Court's Electronic Case Filing System on December 23, 2016.

<div style="text-align:right">

/s/ Shane P. Sanders
Shane P. Sanders

</div>

1137949