# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE: AGNC INVESTMENT CORP (f/k/a AMERICAN CAPITAL AGENCY CORP.), STOCKHOLDER DERIVATIVE ACTION | |
| | Civil Action No. TDC-16-3215<br>Consolidated with TDC-16-3310 |
| This Document Relates To:<br><br>ALL ACTIONS | |

## MEMORANDUM OPINION

James Clem and William Wall, Plaintiffs in these consolidated actions, have brought shareholder derivative suits on behalf of nominal Defendant AGNC Investment Corporation ("AGNC"), alleging that certain AGNC directors and officers (the "Individual Defendants") breached their fiduciary duties to AGNC and violated federal securities law. Plaintiffs also allege that Defendant American Capital Asset Management, LLC ("ACAM") aided and abetted the Individual Defendants in the breach of their fiduciary duties. Pending before the Court are two Motions to Dismiss filed by the Individual Defendants and ACAM, respectively. A hearing on the Motions was held on June 15, 2018. For the reasons set forth below, the Individual Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. ACAM's Motion to Dismiss is GRANTED.

## BACKGROUND

Plaintiffs, both citizens of California, are shareholders of AGNC. AGNC is a Delaware-incorporated real estate investment trust ("REIT"), with principal executive offices in Bethesda,

Maryland. The 11 Individual Defendants include Defendants Gary Kain, Prue B. Larocca, Morris A. Davis, Larry K. Harvey, Malon Wilkus, John R. Erickson, Samuel A. Flax, Robert M. Couch, Randy E. Dobbs, and Alvin N. Puryear, who have each served, at various times, as members of the AGNC Board of Directors, and Defendant Peter J. Federico, who was an officer of AGNC. Defendants Kain, Wilkus, Erickson, and Flax have also served as officers of AGNC. Defendant ACAM is a wholly owned subsidiary of American Capital Ltd. ("American Capital"). ACAM owned American Capital Mortgage Management, LLC ("ACMM"), which in turned owned AGNC.

The claims in this case relate primarily to a series of transactions involving the management of AGNC. According to Plaintiffs, prior to May 23, 2016, AGNC was externally managed by American Capital AGNC Management, LLC ("AGNC Manager"), a related entity also owned by ACMM. AGNC Manager was subject to the supervision and oversight of AGNC's Board. At the time, AGNC had no dedicated employees of its own. Rather, AGNC Manager was responsible for administering AGNC's day-to-day business activities. AGNC and AGNC Manager were both subsidiaries of American Capital. Other American Capital subsidiaries included American Capital Mortgage Investment Corporation ("MTGE"), another REIT; American Capital MTGE Management, LLC ("MTGE Manager"), which was responsible for administering MTGE's day-to-day operations; Defendant ACAM; American Capital Senior Floating, Ltd. ("ACSF"), and several other related entities. American Capital, AGNC, AGNC Manager, MTGE, and MTGE Manager, along with other American Capital subsidiaries, shared multiple directors and officers, some of whom are Defendants in this case.

The primary focus of the Amended Complaint is the contract that governed the relationship between AGNC and AGNC Manager before May 23, 2016 (the "Management

Agreement"). According to Plaintiffs, the terms of the Management Agreement required AGNC to pay AGNC Manager "exorbitant fees in excess of $100 million" each year, regardless of the performance of AGNC's investment portfolio. Am. Compl. ¶ 6, ECF No. 39. Plaintiffs allege that the fees were unreasonable and in excess of the costs of services performed; subsidized the operations of MTGE and MTGE Manager, both of whose Board of Directors, employees, and management overlapped with those of AGNC and AGNC Manager; and ultimately ended up in the pockets of the Individual Defendants, who served as directors and officers of AGNC, AGNC Manager, MTGE, MTGE Manager, ACAM, American Capital, and other American Capital entities. Plaintiffs assert that the members of AGNC's Board of Directors owed a fiduciary duty to AGNC that required them to renegotiate or cancel the Management Agreement, but because they personally benefited from the payment of the fees, they failed to do so.

Plaintiffs also allege that AGNC's directors negligently made false and misleading statements relating to the Management Agreement in proxy solicitations sent to shareholders between 2014 and 2016 (the "Proxy Statements"), in which AGNC's directors requested that shareholders vote to re-elect them to AGNC's Board. The Proxy Statements acknowledged that AGNC would be forced to pay a significant penalty for terminating the Management Agreement without cause, but they failed to disclose or explain favorable provisions of the Management Agreement that provided opportunities to negotiate more reasonable terms. According to Plaintiffs, the Proxy Statements misled shareholders into believing that AGNC was locked into the Management Agreement unless it was willing to pay a large termination fee. Plaintiffs also assert that the Proxy Statements failed to disclose and explain the extent of AGNC's overpayment to AGNC Manager for the value of its services, or that AGNC's management fees were being used to cover the external management of MTGE. Plaintiffs claim that had AGNC's

shareholders been aware that the Proxy Statements were misleading, they would not have voted to re-elect the Board.

The second focus of the Amended Complaint is the May 23, 2016 transaction that altered the relationship between AGNC and AGNC Manager ("the Internalization"). On that date, AGNC announced that it would acquire ACMM, the parent company of AGNC Manager and MTGE Manager, for $562 million, thereby becoming an internally managed REIT. The $562 million was paid to ACAM, which at the time owned ACMM and employed Defendants Wilkus, Erickson, and Flax as executives. According to Plaintiffs, the Internalization was damaging to AGNC because it cost $200 million more than AGNC would have paid had it simply terminated the Management Agreement and arranged to manage its own activities internally. Plaintiffs claim that the Internalization grossly overvalued AGNC Manager, the value of which was inflated due to the excessiveness of the management fees that AGNC had been paying for years. Plaintiffs assert that ACAM, by selling ACMM to AGNC, knowingly assisted the Individual Defendants in breaching their fiduciary duties to AGNC, and that without ACAM's assistance, the Internalization would not have occurred.

On September 21, 2016, Plaintiff James Clem filed a shareholder derivative complaint on behalf of AGNC. Plaintiff William Wall filed a second shareholder derivative complaint on September 30, 2016. Pursuant to a stipulation, the Court consolidated the cases on October 21, 2016. Plaintiffs filed their consolidated Amended Complaint on December 23, 2016. In Count I, asserted against Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus, Plaintiffs allege a violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. S 78n(a) (2012). In Count II, asserted against all of the Individual Defendants, Plaintiffs allege that the Individual Defendants breached their fiduciary duties to

AGNC by renewing the Management Agreement from 2014 to 2016 and by approving the Internalization. Finally, in Count III, asserted against ACAM, Plaintiffs allege that ACAM aided and abetted the Individual Defendants in the breach of their fiduciary duties regarding the Internalization. Plaintiffs seek a declaratory judgment, damages, equitable and injunctive relief, restitution, and costs.

## DISCUSSION

AGNC and the Individual Defendants seek dismissal of Count I, Plaintiffs' Section 14(a) claim, on the grounds that the challenged Proxy Statements did not cause the alleged harm to AGNC. They seek dismissal of Count II, the breach of fiduciary duty claim, because (1) Plaintiffs failed to make pre-suit demand, and (2) Plaintiffs' allegations do not establish that a breach of fiduciary duty occurred. ACAM seeks dismissal of Count III, the aiding and abetting a breach of fiduciary duty claim, on the grounds that (1) the claim is contractually barred; (2) Maryland law does not recognize the tort of aiding and abetting a breach of fiduciary duty; and (3) Plaintiffs failed to allege sufficient facts to support a plausible claim of aiding and abetting a breach of fiduciary duty.

## I.     Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege sufficient facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Legal conclusions or conclusory statements do not suffice. *Id*. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of*

*Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005). A court may consider documents attached to the motion when determining whether to dismiss the complaint if the documents were integral to and explicitly relied on in the complaint, and the plaintiff does not challenge their authenticity. *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999).

## II. Count I: Section 14(a)

Plaintiffs allege that Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus, who served on AGNC's Board of Directors from 2014 to 2016, negligently caused AGNC to issue false and misleading Proxy Statements, which solicited shareholder votes for their re-election to AGNC's Board. In response, Defendants argue that, since Plaintiffs allege that AGNC was harmed by the Board's annual decision to renew the Management Agreement with AGNC Manager, and that decision was not directly approved by the shareholders in response to the Proxy Statements, the claim should be dismissed because the renewals of the Management Agreement were not directly authorized by the votes solicited by the Proxy Statements.

Section 14(a) of the Exchange Act makes it unlawful to solicit, through an instrumentality of interstate commerce, "any proxy or consent or authorization in respect of any security" in contravention of rules established by the United States Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78n(a)(1) (2012). As relevant here, SEC Rule 14a-9 prohibits the use of a proxy statement that is "false or misleading with respect to any material fact or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a) (2018). "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Gaines v. Haughton*, 645 F.2d 761, 773 (9th Cir.

1981). To assert a claim for a violation of Section 14(a), a plaintiff must show "that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction" that produced the injury. *Hayes v. Crown Cent. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)). The second and third elements have been termed "loss causation" and "transaction causation," respectively. *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000); *Wilson v. Great Am. Indus.*, 979 F.2d 924, 931 (2d Cir. 1992).

Here, Plaintiffs address loss causation by asserting that the repeated renewals of the Management Agreement caused an economic loss to them. As for transaction causation, Section 14(a) is violated when "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction" that resulted in the economic loss at issue. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970). Thus, the United States Courts of Appeals have consistently held that successfully pleading "transaction causation" in a Section 14(a) suit requires a showing that the challenged proxy statement induced shareholders to directly authorize the specific transaction that resulted in the economic loss. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796–97 (11th Cir. 2010) ("*Goodman*"); *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992).

For example, in *Cathcart*, the plaintiff alleged a Section 14(a) violation based on a proxy solicitation that omitted reference to corporate misconduct, including fraudulent billing, failing to supervise a flawed nuclear power plant construction project, and reckless real estate investments. *Id.* at 929. However, the proxy statements that formed the basis of the Section

14(a) claim solicited shareholder votes to re-elect the Board of Directors and to amend certain corporate governance documents so as to limit liability for company directors. While the plaintiff alleged that the Board would not have been re-elected by the shareholders had the proxy statements revealed the directors' misconduct, the United States Court of Appeals for the Third Circuit nevertheless held that transaction causation had not been satisfied, on the grounds that the proxy statements "did not create any cognizable harm because the shareholders' votes did not authorize the transactions that caused the losses." *Id.* at 930, 933. The Court concluded that "the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss" to satisfy the requirement of transaction causation. *Id.* at 933.

The United States Court of Appeals for the Eleventh Circuit has likewise concluded that allegedly false statements in a proxy solicitation, which was issued to secure the re-election of the Board of Directors and shareholder approval of certain corporate policies, did not cause the losses resulting from a stock option backdating scheme perpetrated by the directors. *Goodman*, 594 F.3d at 796–97. The court reasoned that because "the election of directors who violated" stock option policies "only indirectly caused the shareholders' loss," the "decision to violate company policies was not accomplished or endorsed by any proxy solicitation materials." *Id.*; *see also Fisher v. Kanas*, 467 F. Supp. 2d 275, 283 (E.D.N.Y. 2006) (finding a lack of transaction causation when the challenged proxy statements related to the election of the Board of Directors, not to the adoption of the change-in-control executive compensation agreements alleged to have caused economic losses to the company).

The United States Court of Appeals for the Ninth Circuit has essentially reached the same conclusion. Noting that "[t]he purpose of § 14(a) was clearly to prohibit management from

deceptively securing stockholder approval *for transactions requiring such approval*," the court concluded that "for *damages* claims relating to the directors' failure to disclose misconduct and/or mismanagement (other than self-dealing or fraud against the corporation), there is no . . . 'transactional causation,' without regard to the issue of materiality, so long as the underlying transaction did not require shareholder approval." *Gaines*, 645 F.2d at 775 (emphasis added).

Finally, without deciding the issue, the United States Court of Appeals for the Eighth Circuit has also favorably referenced cases holding that transaction causation requires that harm to shareholders result "from the corporate transactions which were authorized as a result of the false or misleading proxy solicitations" and upheld the dismissal of a Section 14(a) claim where the allegedly misleading proxy solicitations sought votes on corporate matters unrelated to the alleged corporate waste and mismanagement that had harmed shareholders. *See Abbey v. Control Data Corp.*, 603 F.2d 724, 732 (8th Cir. 1979).

Consistent with this authority, this Court agrees that transaction causation requires that a Section 14(a) claim be based on false or misleading statements in proxy materials disseminated to secure shareholder votes to authorize the corporate decision that allegedly caused the economic harm to the shareholders. This limitation is consistent with the Supreme Court's view that "[t]he purpose of [Section] 14(a) is to prevent management or others from obtaining *authorization for corporate action* by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (emphasis added). It also prevents the misuse of federal securities law to advance in federal court state law claims "to redress alleged mismanagement or breach of fiduciary duty." *Field v. Trump*, 850 F.2d 938, 947 (2d Cir. 1988).

Plaintiffs argue that there is an exception to the transaction-causation rule for when directors are accused of fraud or self-dealing, and that Plaintiffs have sufficiently alleged that the relevant Defendants here engaged in a form of self-dealing as a result of their conflicting loyalties to American Capital and its many subsidiaries. In support, Plaintiffs rely on the parenthetical in *Gaines* in which the court stated that "for *damages* claims relating to the directors' failure to disclose misconduct and/or mismanagement (other than self-dealing or fraud against the corporation), there is no . . . 'transactional causation,' without regard to the issue of materiality, so long as the underlying transaction did not require shareholder approval." *Gaines*, 645 F.2d at 775. Plaintiffs assert that this language establishes that when directors have engaged in self-dealing or fraud, the transaction-causation element is relaxed, and the company's failure to disclose the directors' fraudulent behavior in proxy statements relating to their re-election creates a Section 14(a) claim for damages arising from the harm perpetrated on the company by the undisclosed wrongdoing.

This argument fails for two reasons. First, at the hearing on the motions, Plaintiffs clarified that they are not alleging that the Individual Defendants engaged in self-dealing in the traditional sense when they renewed the Management Agreement. That is, the directors were not on both sides of the transaction. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995). As Plaintiffs also do not allege that the Individual Defendants engaged in fraud, the purported exception for self-dealing or fraud would be inapplicable.

Second, Plaintiffs take the parenthetical statement out of context. In *Gaines*, the plaintiff brought a Section 14(a) claim arguing that directors had been elected based on misleading proxy statements that had failed to disclose the directors' practice of bribing foreign officials. *Gaines*, 645 F.2d at 765–66. Rather than seeking money damages, the plaintiff asked the court to set

aside the directors' election.  *Id.* at 766.  The court explicitly distinguished between Section 14(a) claims that attack the director election itself, and those that seek money damages as compensation for corporate wrongdoing.  *Id.* at 776.  Concluding that transaction causation is satisfied when the challenged action is the election to which the proxy solicitation related, the court noted that in such cases plaintiffs would still need to show that the alleged false proxy statement was "material," in that it actually affected the election.  *Id*. at 776.  On this separate question, the court held that unlike acts of mere corporate mismanagement, which may not need to be disclosed in a proxy statement relating to a Board election, self-dealing, dishonesty, and deceit benefiting the directors are "presumptively material" facts, the omission of which would give rise to a Section 14(a) claim challenging the validity of the election.  *Id.* at 776–79.  Thus, in context, the parenthetical's exception for allegations of fraud and self-dealing is most fairly understood as distinguishing allegations of mismanagement as they relate to the issue of materiality, which was the central issue in *Gaines*, not as they relate to the issue of transaction causation, which was not addressed by the court.  *See id.* at 775.  This reading is consistent with how at least one other court has read *Gaines*.  *Royal Business Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1063 (1st Cir. 1991) (citing *Gaines* for the proposition that "[t]he need to plead and prove a transactional nexus in a proxy solicitation case is not legitimately in doubt").  Plaintiffs' reliance on *In re Diamond Foods, Inc.*, No. C 11-05692-WHA, 2012 WL 1945814 (N.D. Cal. May 29, 2012), which dismissed a Section 14(a) claim while noting that allegations of self-dealing are presumptively material under *Gaines*, is similarly misplaced.  The district court there did not address the requirement of transaction causation.  *See id.* at *7.

Plaintiffs also rely on *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), cited at the hearing, but there the Section 14(a) claim arose out of a proxy solicitation that sought

shareholder authorization for the specific transaction—a merger—alleged to have caused the economic harm. *Id.* at 1088. Plaintiffs also note that several district courts have allowed Section 14(a) claims to proceed against directors when the company failed to disclose, in proxy statements relating to Board elections, fraudulent business practices engaged in by the directors, under the theory that, had the proxy statements disclosed the fraudulent behavior, the directors would not have been re-elected and the fraud would have ceased. That reliance is misplaced. In *In re Wells Fargo & Co.*, 282 F. Supp. 3d 1074 (N.D. Cal. 2017), the court held that a Section 14(a) claim may not be premised on mismanagement or a breach of fiduciary duty, which is the precise theory alleged here. *Id.* at 1102–03 (finding a Section 14(a) claim based on fraud). As for the remaining cases, they do not directly address whether transaction causation requires that the shareholder vote prompted by the challenged proxy solicitation directly authorized the transaction that caused the economic loss. *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 655 (N.D. Tex. 2010); *In re Maxim Integrated Prods.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008); *In re Zoran Corp.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007). Notably, these cases are counter-balanced by cases in the same districts that echo the conclusions reached in *Cathcart* and *Goodman*. *See In re Affiliated Computer Servs.*, 540 F. Supp. 2d 695, 703–04 (N.D. Tex. 2007) (holding, based on *Cathcart*, that transaction causation had not been established where the plaintiff alleged that a proxy statement failed to disclose the company's practice of backdating stock options, where the proxy solicitation related to votes on the directors' positions and executive compensation); *In re Verisign, Inc.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) (same).

Plaintiffs have thus provided no persuasive basis to undermine *Cathcart* and *Goodman*. Transaction causation mandates that the challenged conduct that caused the economic loss be an

action authorized by shareholder vote, not later misconduct undertaken by the Board. *See Cathcart*, 980 F.2d at 933; *Goodman*, 594 F.3d at 796–97. Such a rule is consistent with the Supreme Court's caution that, when interpreting federal securities law, we must refrain from "federaliz[ing] the substantial portion of the law of corporations that deals with transactions in securities." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

Nevertheless, Plaintiffs contend that transaction causation exists here because, in this unique factual scenario, the shareholders' decision to re-elect the Board was effectively a referendum on the Board's primary task: deciding whether to renew the costly Management Agreement. The Court is unconvinced. Transaction causation would be established if Plaintiffs were challenging the directors' re-election itself, which if successful would result in this Court ordering a new election with the use of accurate proxy statements. Instead, however, Plaintiffs are seeking money damages as compensation for the renewal decision, which was not itself put to a vote of the shareholders through the dissemination of the Proxy Statements. *See Gaines*, 645 F.2d at 775–76 (distinguishing between Section 14(a) claims arising from false or misleading proxy statements relating to a director election based on whether the plaintiffs were seeking either to undo the election itself, or to obtain damages for mismanagement perpetrated after the directors were elected). Moreover, a review of the proxy solicitation reveals that it cannot fairly be construed as characterizing the Board's role as consisting exclusively or primarily of voting to renew the Management Agreement. The proxy solicitation reviewed the structure of the Board, the compensation arrangement for the Directors, provided information about the individual Directors seeking re-election, and described the Board's role in risk oversight. Although it described the Management Agreement in the context of disclosing transactions with related persons, it did not explicitly or implicitly convey the message that the Board's primary function

is to consider and approve the Management Agreement. Thus, a vote to re-elect the Board could not necessarily be characterized as a vote to approve the renewal of the Management Agreement. Plaintiffs' allegations therefore fail to demonstrate transaction causation, as required for Section 14(a) claims.

Because the Court will dismiss Plaintiffs' Section 14(a) for failure to plead facts sufficient to establish transaction causation, it does not reach the separate argument that the challenged Proxy Statements did not contain a material misrepresentation or omission.

## III.    Count II:  Breach of Fiduciary Duty

In Count II, Plaintiffs allege that the Individual Defendants breached their fiduciary duty to AGNC by approving the Management Agreement year after year, despite its high fees, and by approving the Internalization, which required AGNC to pay $562 million to ACAM.   The Individual Defendants seek dismissal of the breach of fiduciary duty claim on the grounds that Plaintiffs failed to make a demand on AGNC's Board to bring suit on this claim, and that Plaintiffs have otherwise failed to state a valid claim.

### A.    Choice of Law

A federal court sitting in diversity applies the choice-of-law principles of the forum state, in this case, Maryland.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Zimmerman v. Novartis Pharm. Corp.*, 889 F. Supp. 2d 757, 761 (D. Md. 2012).  On a claim for breach of fiduciary duty, which involves "a matter peculiar to the relationships among and between the corporation and its . . . directors," Maryland courts follow the "internal affairs doctrine" and apply the law of the state of incorporation.  *See Storetrax.com, Inc. v. Gurland*, 895 A.2d 355, 372–73 (Md. Ct. Spec. App. 2006) (holding that because the plaintiff corporation was incorporated in Delaware, the trial court erred in not applying Delaware law to its claim that the

defendant had breached his fiduciary duty), *aff'd* 915 A.2d 991 (Md. 2007); *see also Restatement (Second) of Conflict of Law* § 309 ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation[.]"). AGNC is incorporated in Delaware, so this Court applies Delaware law to the breach of fiduciary duty claim.

### B.     Demand Futility

The Individual Defendants first argue that the breach of fiduciary duty claim should be dismissed because Plaintiffs failed to make a pre-suit demand upon AGNC's Board of Directors to remedy the alleged harm to AGNC.  In response, Plaintiffs contend that making a pre-suit demand at or before the time their suit was filed would have been futile.

Federal Rule of Civil Procedure 23.1 requires that plaintiffs bringing shareholder derivative actions "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  This rule is known as the pre-suit demand requirement.  Because AGNC is incorporated in Delaware, this Court turns to Delaware law to determine whether the Plaintiffs needed to make a pre-suit demand or whether such a demand would be futile, such that the requirement is waived.  *See Garnitschnig v. Horovitz*, 48 F. Supp. 3d 820, 829 (D. Md. 2014).

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  Managing the corporation's affairs includes bringing lawsuits on the corporation's behalf.  *Id.* at 811–12.  Where a shareholder derivative suit "allows a shareholder to initiate action on behalf of a corporation," shareholders seeking to bring a

derivative suit must "first make[] a demand upon the board with respect to [the] claim or, in the alternative, demonstrate[] that it would be futile to do so." *Garnitschnig*, 48 F. Supp. 3d at 830.

When the Board of Directors that would consider the demand to file suit, in fact, made the challenged business decision, shareholders may establish the futility of making a pre-suit demand through the two-part test set forth in *Aronson*. 473 A.2d at 812–13; *see Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Under this test, demand futility may be established by showing that there is a reasonable doubt either (1) that the directors are "disinterested and independent," or (2) that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. "[I]f either prong is satisfied, demand is excused." *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

A director is independent if the "director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson¸* 473 A.2d at 816. Therefore, when analyzing *Aronson*'s first prong, courts ask whether a majority of the Board at the time the lawsuit was filed was "incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims." *Brehm*, 746 A.2d at 257. A showing that a majority of the directors were "self-dealing," or interested in the transaction, such that the business judgment rule was inapplicable to the board approving the transaction, would establish this prong. *See Aronson*, 473 A.2d at 815. Directors engage in "self-dealing" when they are on both sides of a transaction or stand to benefit from the transaction. *Cinerama*, 663 A.2d at 1169; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993). "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or where the decision "will have a materially detrimental impact on a director, but not on the

corporation and the stockholders." *Rales*, 634 A.2d at 936.  Although, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors," when the transaction was "so egregious" that a "substantial likelihood" of director liability exists, the first prong is satisfied. *Aronson*, 473 A.2d at 815.

As for the second prong, a plaintiff may rebut the presumption that directors engaged in a valid exercise of business judgment "by raising a reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation." *In re Walt Disney Co.*, 825 A.2d 275, 286 (Del. Ch. 2003).

Plaintiffs allege multiple breaches of fiduciary duty.  Because the demand futility analysis is "conducted on a claim-by-claim basis" under Delaware law, the Court will address the Board's decision to renew the Management Agreement separately from its decision to approve the Internalization. *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015) (citation omitted).

Regarding the Management Agreement renewals, the Complaint in this matter was originally filed on September 21, 2016, when Defendants Kain, Larocca, Davis, and Harvey constituted the entirety of the AGNC Board of Directors.  In their role as directors, Defendants Larocca, Davis, and Harvey allowed the annual renewals of the Management Agreement to proceed from 2013 until 2016.  At the same time, Larocca, Davis, and Harvey also served on the Board of MTGE, whose operation was allegedly subsidized by the excessive fees paid by AGNC pursuant to the Management Agreement.

"[I]nterlocking boards of directors within an investment complex are neither prohibited nor uncommon." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 330 (4th Cir. 2001). In the context of the Investment Company Act, which regulates mutual funds, the SEC takes the position that "a director of a fund who is also a director of another fund managed by the same adviser generally would not be viewed as an interested person of the fund . . . solely as a result of this relationship." *Cf. id.* However, while having dual fiduciary duties presents no concern when the interests of the beneficiaries are aligned, once "the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest," for which there is no "safe harbor" under Delaware law. *In re Trados, Inc.*, 73 A.3d 17, 47 (Del. Ch. 2013). Plaintiffs' allegations that the directors had fiduciary duties to both AGNC and MTGE, and that the renewals of the Management Agreement were financially detrimental to AGNC but advantageous to MTGE, are therefore sufficient to establish a conflict of interest that raises a reasonable doubt "whether the directors honestly and in good faith believed that the action was in the best interests of the corporation," thereby meeting *Aronson*'s second prong. *In re Walt Disney Co.*, 825 A.2d at 286. Defendants' arguments in response are primarily factual, as they contend that AGNC did not in fact suffer from the Management Agreement's yearly renewal and that MTGE was not unduly advantaged by it. On a Motion to Dismiss, however, where the Court must construe the factual allegations in the complaint in the light most favorable to the plaintiff, the Court will not reject Plaintiffs' allegations out of hand. The Court therefore finds that demand was futile as to the breach of fiduciary duty claim arising from the annual renewal of the Management Agreement.

As for the Internalization, that transaction was approved by all members of the Board: Kain, Larocca, Davis, and Harvey. At the time that the Internalization was approved, Kain was plainly "interested" in the transaction in that he served as the Chief Executive Officer, President,

and Chief Investment Officer of both AGNC and MTGE, was a director of both entities, and was also the President of both AGNC Manager and MTGE Manager, from which he drew a combined $4.4 million in salary. Kain therefore had a financial interest in the Internalization different from that of AGNC shareholders, because he stood to gain from ensuring that through the Internalization, MTGE continued to obtain management services at a subsidized rate, and that AGNC Manager and MTGE Manager continued to be paid at a high rate, while he stood to lose his salary from AGNC Manager and MTGE Manager in the event that the Internalization did not occur and the Management Agreement was instead terminated.

For the remaining directors, however, they did not have, at the time of the Internalization vote, divided loyalties which would give this Court reasonable doubt as to their disinterestedness or as to whether they honestly and in good faith believed that the Internalization was in AGNC's best interest. The Amended Complaint alleges that Larocca, Davis, and Harvey served on the MTGE Board only until "May 2016." Am. Compl. ¶¶ 28-30. The Internalization was announced on May 26, 2016. At the hearing on the Motion, Defendants asserted, and Plaintiffs did not dispute, that the vote on Internalization occurred shortly after these directors resigned from the MTGE Board as part of a concerted effort to avoid conflicts of interest that might arise upon the execution of the Internalization, because once the Internalization was accomplished, MTGE would start paying management fees to AGNC as the owner of ACMM, MTGE Manager's parent company. Thus, although Davis, Harvey, and Larocca may well have participated in discussions regarding the Internalization, at the time of the vote to approve that action, they did not owe any loyalty to MTGE.

Nor have Plaintiffs alleged sufficient facts to establish that this is one of those rare cases where directors' behavior is so "egregious" that they face a "substantial likelihood" of liability

that will excuse demand. *Aronson*, 473 A.2d at 815; *Rales*, 634 A.2d at 936. This basis for demand futility must be applied with "great care" and requires specific facts that "overcome the powerful presumptions of the business judgment rule" and support the conclusion that the action "cannot be attributed to any rational business purpose." *In re InfoUSA, Inc. Shareholders Litigation*, 953 A.2d 963, 972 (Del. Ch. 2007). While Plaintiffs allege that the $562 million price for the Internalization was excessive, as it was based on the allegedly excessive management fees that AGNC had been paying for years, they also admit that the Internalization saved AGNC approximately $80 million a year. The Court cannot say that absent a conflict of interest, a transaction that can be viewed as paying for itself within seven years and as securing a service that otherwise cost AGNC over $100 million a year was so egregious as to excuse pre-suit demand.

Plaintiffs note that in a related case in the Delaware Court of Chancery, brought by a different plaintiff against AGNC and many of the same individuals named as Defendants here, the court determined that demand was futile as to the Internalization claim because there is reason to doubt that AGNC's Board was adequately informed when approving the Internalization. *In Re: H&N Management Grp., Inc. & Aff Cos Frozen Money Purchase Plan*, 42 Del. J. Corp. L. 191 (Del. Ch. 2017). That decision, however, was based upon allegations not contained in the Amended Complaint, which cannot provide a basis for this Court's decision upon a Motion to Dismiss. *Id.* at 198–201. The Court therefore finds that pre-suit demand was not futile as to the Internalization, such that this aspect of the breach of fiduciary duty claim must be dismissed.

### C.    Failure to State a Claim

Finally, Defendants argue that Plaintiffs have failed to allege sufficient facts to state a claim for breach of fiduciary duty relating to the renewals of the Management Agreement. Because Plaintiffs have satisfied *Aronson*'s second prong to show demand futility, they have necessarily satisfied the pleading standard for a Rule 12(b)(6) motion, provided that the Complaint "otherwise contains sufficient facts to state a cognizable claim." *See McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008); *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007). Construing the Amended Complaint in the light most favorable to the non-moving party, as the Court must, the Court finds that Plaintiffs have offered sufficient facts on this claim by alleging that the Individual Defendants repeatedly renewed the Management Agreement, despite its exorbitant cost, because it benefited an organization to which the Individual Defendants owed a conflicting fiduciary duty, specifically, MTGE. The arguments to the contrary amount to disputes on the underlying facts, and therefore do not provide a basis to warrant dismissal at this early stage of the case. The Court thus will not dismiss the breach of fiduciary duty claim arising from the renewals of the Management Agreement.

## IV.    Count III:  Aiding and Abetting a Breach of Fiduciary Duty

In Count III, Plaintiffs allege that Defendant ACAM aided and abetted the Individual Defendants in the breach of their fiduciary duty when they approved the Internalization. ACAM seeks dismissal of Count III on the grounds that (1) the claim is contractually barred; (2) Maryland law does not recognize the tort of aiding and abetting a breach of fiduciary duty; and (3) Plaintiffs failed to allege sufficient facts to state a plausible claim for relief.

### A. Demand Futility

Before turning to the arguments asserted in ACAM's Motion, the Court first addresses the issue of demand futility. At the hearing, both parties agreed that, should the Court find that demand was not futile for Plaintiffs' breach-of-fiduciary-duty claim as it relates to the Internalization, the requirement of demand futility would not be met for this accompanying aiding-and-abetting claim. The Court agrees. *See, e.g.*, *DiRienzo v. Lichtenstein*, No. 7094-VCP, 2013 WL 5503034, at *36 (Del. Ch. Sept. 30, 2013) (dismissing an aiding and abetting breach of fiduciary duty claim after finding that demand was not futile as to the underlying claim for breach of fiduciary duty).

Because the Court has already determined that demand futility was not established as to the breach of fiduciary duty claim relating to the Internalization, it is likewise not established for the aiding-and-abetting claim, which must therefore be dismissed. However, because Plaintiffs have again sought leave to amend their Complaint in the event of dismissal of any of their claims, the Court will also address ACAM's remaining arguments.

### B. Contractual Bar

ACAM argues that the claim against it is barred by specific terms of both (1) the Management Agreement between AGNC and AGNC Manager and (2) AGNC's Purchase Agreement to acquire ACMM. ACAM is incorrect on both counts.

The Management Agreement provides that "neither the Manager nor any of its Affiliates," which would include Defendant ACAM, "shall be liable to [AGNC], the Board of Directors, or [AGNC's] stockholders for any act or omission by the Manager of any of its Affiliates, except as provided in Section 8 of this Agreement." Management Agreement at 9, Mot. Dismiss Ex. 2, ECF No. 94-4. Section 8 provides, as relevant here: "The Manager and its

Affiliates . . . will not be liable to AGNC . . . for any act or omissions . . . performed in accordance with and pursuant to this Agreement . . . ." *Id.* at 18.  This limitation on liability is thus inapplicable here because the claim for aiding and abetting a breach of fiduciary duty does not arise out of actions performed by ACAM in accordance with and pursuant to the Management Agreement.  The Internalization was a wholly separate transaction unrelated to the actions taken to manage AGNC's affairs.

The Purchase Agreement, in turn, provides that AGNC will acquire all of ACMM's "interests" through the Internalization.  Purchase Agreement at 3, Mot. Dismiss Ex. 4, ECF No. 94-6.  ACAM argues that this provision means that AGNC purchased the liability for the aiding-and-abetting claim when it completed the Internalization.  The Court disagrees.  The aiding-and-abetting claim is alleged against ACAM for its own behavior, not against ACMM for any actions taken while ACMM still belonged to ACAM.  AGNC's purchase of ACMM therefore had no effect on the aiding-and-abetting claim against ACAM.

ACAM also argues that Plaintiffs' aiding-and-abetting claim is foreclosed by the provision in the Purchase Agreement limiting any remedy for a breach of the Purchase Agreement.  *Id.* at 49.  This argument is also incorrect because Plaintiffs do not allege in their aiding-and-abetting claim that the Purchase Agreement was violated in any way.  The Court therefore rejects ACAM's argument that Plaintiffs are contractually barred from asserting their claim of aiding and abetting a breach of fiduciary duty against ACAM.

## C.      Choice of Law

ACAM next argues that Maryland law applies to this claim because the alleged injury occurred in Maryland, where AGNC is headquartered, and that as a result, this claim must be

dismissed because Maryland does not recognize the tort of breach of fiduciary duty. This argument fails because Delaware law applies to this claim.

As discussed above, Maryland has adopted the internal affairs doctrine, which applies the law of a corporation's state of incorporation to those claims relating to "the relationships among and between the corporation and its . . . directors." *Storetrax.com, Inc.*, 895 A.2d at 372–73. The parties have not cited, and the Court has not identified, Maryland case law addressing whether the internal affairs doctrine extends to an aiding-and-abetting claim accompanying a breach of fiduciary duty claim. However, in applying the internal affairs doctrine, Delaware courts have held that a claim for aiding and abetting a breach of fiduciary duty is a matter of Delaware law when the underlying breach of fiduciary duty is also governed by Delaware law. *See, e.g.*, *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1211-12 (Del. Ch. 2010); *see also In re Am. Ambulette & Ambulance Serv. Inc.*, 560 B.R. 256, 263 (E.D.N.C. 2016) (applying the internal affairs doctrine to hold that under North Carolina law, claims of aiding and abetting a breach of fiduciary duty are properly considered under the law of the state of incorporation).

The Court finds this authority persuasive. According to the Restatement (Second) of Conflict of Laws, when answering a choice-of-law question, courts should consider several factors, including ensuring the "certainty, predictability and uniformity of result." *Restatement (Second) of Conflict of Law* § 6. Were the Court to adopt ACAM's proposed rule, and impose Maryland law on the aiding-and-abetting claim while using Delaware law for the prerequisite breach of fiduciary duty claim, mismatched results could follow, which would make it difficult for parties to anticipate what actions are tortious in any given situation. The Court therefore holds that Delaware law applies to the aiding-and-abetting claim. Accordingly, ACAM's

argument that Plaintiffs' aiding-and-abetting claim must be dismissed, on the ground that Maryland law does not allow for a claim of breach of fiduciary duty, necessarily fails.

### D. Failure to State a Claim

Finally, ACAM argues that even if Delaware law applies, Plaintiffs failed sufficiently to allege a claim of aiding and abetting a breach of fiduciary duty. The Court agrees.

Under Delaware law, the elements of a claim for aiding and abetting a breach of a fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Gotham P'rs, P.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002). Significantly, a defendant must "act with the knowledge that the conduct advocated or assisted constitutes" a breach of fiduciary duty. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) Although the Amended Complaint asserts that the Individual Defendants breached a fiduciary duty by approving the Internalization, and that ACAM participated in that transaction by selling ACMM to AGNC, it provides no allegations that ACAM had knowledge that the transaction constituted a breach of fiduciary duty by the Individual Defendants. For example, while Plaintiffs allege that Defendants Wilkus, Erickson, and Flax were all officers of ACAM at the time of the Internalization, there are no allegations that these Defendants knew that the terms of the Internalization were sufficiently adverse to AGNC that its approval on behalf of AGNC would constitute a breach of fiduciary duty. Merely alleging that ACAM entered into the Internalization agreement is insufficient to state an aiding-and-abetting claim. *See id.* (holding that a third party does not knowingly participate in a breach of fiduciary duty by attempting to "reduce the sale price through arm's-length negotiations"). Because the Amended Complaint

fails to allege facts supporting a reasonable inference of knowing participation in a breach of fiduciary duty, the Court will dismiss the claim against ACAM for aiding and abetting a breach of fiduciary duty.

In their memorandum in opposition to the Motions to Dismiss, Plaintiffs sought leave to amend their Complaint should the Court dismiss any of their claims. Where the case remains at its early stages, the Court will grant that request and will allow Plaintiffs to file a Motion for Leave to File a Second Amended Complaint, in accordance with Local Rule 103.6, within 14 days of the date of the accompanying Order. *See* Fed. R. Civ. P. 15. Any such motion may seek to amend only as to the deficiencies identified above.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss by AGNC and the Individual Defendants is GRANTED IN PART and DENIED IN PART. The Motion to Dismiss by ACAM is GRANTED. A separate Order shall issue.


Date: July 3, 2018

THEODORE D. CHUANG
United States District Judge