# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE: AGNC INVESTMENT CORP (f/k/a AMERICAN CAPITAL AGENCY CORP.), STOCKHOLDER DERIVATE ACTION | |
| | Civil Action No. TDC-16-3215 Consolidated with TDC-16-3310 |
| This Document Relates To: ALL ACTIONS | |

## MEMORANDUM OPINION

James Clem and William Wall, Plaintiffs in these consolidated actions, have brought shareholder derivative suits on behalf of nominal Defendant AGNC Investment Corporation ("AGNC"), alleging that certain AGNC directors and officers (the "Individual Defendants") breached their fiduciary duties to AGNC and violated federal securities law. Plaintiffs also allege that Defendant American Capital Asset Management, LLC ("ACAM") aided and abetted the Individual Defendants in the breach of their fiduciary duties. Pending before the Court is Plaintiffs' Motion for Leave to File Amended Verified Consolidated Stockholder Derivative Complaint ("Motion to Amend"). The Court held a hearing on the Motion on January 23, 2019. For the reasons set forth below, Plaintiffs' Motion to Amend is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiffs, both citizens of California, are shareholders of AGNC. AGNC is a Delaware-incorporated real estate investment trust ("REIT") with principal executive offices in Bethesda, Maryland. The 11 Individual Defendants include Defendants Gary Kain, Prue B. Larocca, Morris

A. Davis, Larry K. Harvey, Malon Wilkus, John R. Erickson, Samuel A. Flax, Robert M. Couch, Randy E. Dobbs, and Alvin N. Puryear, who have each served, at various times, as members of the AGNC Board of Directors, and Defendant Peter J. Federico, who was an officer of AGNC. Defendants Kain, Wilkus, Erickson, and Flax have also served as officers of AGNC. Defendant ACAM was a wholly owned subsidiary of American Capital, Ltd. ("American Capital"). ACAM owned American Capital Mortgage Management, LLC ("ACMM"), which in turned owned American Capital AGNC Management, LLC ("AGNC Manager"). Prior to May 23, 2016, AGNC Manager externally managed AGNC, subject to the supervision and oversight of the AGNC Board, and was responsible for administering AGNC's day-to-day business activities.

American Capital also owned, by way of its subsidiaries ACAM and ACMM, an entity called American Capital MTGE Management, LLC ("MTGE Manager"). MTGE Manager was responsible for administering the daily operations of another REIT called American Capital Mortgage Investment Corporation ("MTGE"). American Capital, AGNC, AGNC Manager, MTGE, and MTGE Manager, along with other American Capital subsidiaries, shared multiple directors and officers, some of whom are Defendants in this case.

The Court has set forth the detailed factual and procedural background for the challenged transactions in its July 3, 2018 Memorandum Opinion on Defendants' Motions to Dismiss, so it sets forth only those facts specifically relevant here or which have been modified in or added to the proposed Second Amended Complaint. *See In re AGNC Inv. Corp.*, No. TDC-16-3215, 2018 WL 3239476, at *1-2 (D. Md. July 3, 2018). The primary focus of the proposed Second Amended Complaint is the contract that governed the relationship between AGNC and AGNC Manager before May 23, 2016 (the "Management Agreement"). According to Plaintiffs, the members of AGNC's Board of Directors owed a fiduciary duty to AGNC that required them to renegotiate or

2

cancel the Management Agreement, but because they benefited from the payment of fees associated with the Management Agreement, they failed to do so. Plaintiffs also allege that AGNC's directors negligently made false and misleading statements relating to the Management Agreement in proxy solicitations sent to shareholders between 2014 and 2016 (the "Proxy Statements"), in which AGNC requested that shareholders vote to re-elect its directors to AGNC's Board.

The second focus of the proposed Second Amended Complaint is the May 23, 2016 transaction that altered the relationship between AGNC and AGNC Manager ("the Internalization"). On that date, AGNC announced that it would acquire ACMM, the parent company of AGNC Manager and MTGE Manager, for $562 million, thereby becoming an internally managed REIT. According to Plaintiffs, the Internalization was damaging to AGNC because it cost $200 million more than AGNC would have paid had it simply terminated the Management Agreement and arranged to manage its own activities internally. Plaintiffs assert that ACAM, by selling ACMM to AGNC and preventing AGNC directors from obtaining information about the Internalization transaction, knowingly assisted the Individual Defendants in breaching their fiduciary duties to AGNC.

Plaintiffs' First Amended Complaint, filed on December 23, 2016, included three counts. In Count I, Plaintiffs alleged a violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"), 15 U.S.C. § 78n(a) (2012). In Count II, Plaintiffs alleged that the Individual Defendants breached their fiduciary duties to AGNC by renewing the Management Agreement from 2014 to 2016 and by approving the Internalization. Finally, in Count III, Plaintiffs alleged that ACAM aided and abetted the Individual Defendants in the breach of their fiduciary duties regarding the Internalization. In the Court's July 3, 2018 Memorandum Opinion, the Court

dismissed Plaintiffs' Section 14(a) claim for failure to show transaction causation. The Court also dismissed Plaintiffs' breach of fiduciary duty claim as to the Internalization for failure to demonstrate that demand was futile. Finally, the Court dismissed Plaintiffs' aiding and abetting claim against ACAM, again because Plaintiffs failed to demonstrate that demand was futile. However, finding that the case was still in its early stages, the Court granted Plaintiffs leave to file the pending Motion.

## DISCUSSION

Plaintiffs move to amend their Section 14(a) claim to challenge not the renewal of the Management Agreement, the basis for the claim in the First Amended Complaint, but the compensation paid to the directors elected in 2014-2016 who engaged in activities amounting to a breach of their fiduciary duties. They argue that with this change in theory, they have satisfied loss causation and transaction causation, have alleged material omissions from the Proxy Statements, and have thereby stated a valid Section 14(a) claim. Plaintiffs also move to amend their breach of fiduciary duty claim as to the Internalization and argue that with the new allegations, they have established demand futility because the directors who approved the Internalization were inadequately informed and are thus not protected by the business judgment rule, and there is a substantial likelihood that they face personal liability for breach of fiduciary duty. Finally, Plaintiffs argue that because they can now establish demand futility as to the breach of fiduciary duty claim regarding the Internalization, they can also show demand futility as to their aiding and abetting claim against ACAM. They further argue that their new allegations in the proposed Second Amended Complaint state a viable aiding-and-abetting claim against ACAM because they support a reasonable inference that ACAM knowingly participated in the Individual Defendants' breach of fiduciary duty.

4

## I. Legal Standard

Under Federal Rule of Civil Procedure 15(a)(2), a court "should freely give leave" to amend "when justice so requires." "A motion to amend should be denied 'only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)). Amendment is futile if the complaint, as amended, fails to state a claim upon which relief could be granted. *See id.* at 277 (finding that the plaintiff's amended complaint was futile because although it stated a new legal theory, it failed to articulate a cognizable claim upon which relief could be granted).

## II. Section 14(a)

In both the First Amended Complaint and the proposed Second Amended Complaint, Plaintiffs allege that Defendants Couch, Davis, Dobbs, Erickson, Flax, Harvey, Larocca, Puryear, and Wilkus, who served on AGNC's Board of Directors from 2014 to 2016, negligently caused AGNC to issue false and misleading Proxy Statements, which solicited shareholder votes for their re-election to AGNC's Board. The Court dismissed this claim as articulated in the First Amended Complaint because "[t]ransaction causation mandates that the challenged conduct that caused the economic loss be an action authorized by shareholder vote, not later misconduct undertaken by the Board," and the Section 14(a) claim in the First Amended Complaint challenged only the annual renewals of the Management Agreement, not any decision actually authorized by the votes solicited by the Proxy Statements. *In re AGNC Inv. Corp.*, 2018 WL 3239476, at *6 (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) and *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796-97 (11th Cir. 2010)).

5

To remedy this defect, Plaintiffs now purport to challenge the director election itself, as opposed to later misconduct undertaken by the re-elected Board. They assert that by failing to fully disclose in the 2014-2016 Proxy Statements material information regarding the nature of the Management Agreement and its financial impact on AGNC, AGNC prevented its shareholders from making informed decisions whether to re-elect the directors and compensate them accordingly. As relief, they seek "damages inflicted upon the Company in connection with the improper election of and compensation paid to defendants Couch, Davis, Dobbs, Harvey, Larocca, and Puryear" and "new director elections on the basis of a special proxy with appropriate corrective disclosures." Second Am. Compl. ("SAC") ¶ 220, ECF No. 115-2.

## A.   Injunctive Relief

Because intervening Board elections have been held since the 2014-2016 elections, the proposed amendment of the Section 14(a) claim to seek injunctive relief in the form of a new director election by special proxy would be futile because such relief cannot be granted. All United States Courts of Appeals to address this issue have held that challenges to elections of directors for lapsed terms are moot. *See, e.g., Buckley v. Archer-Daniels-Midland Co.*, 111 F.3d 524, 526-27 (7th Cir. 1997) (holding that an action to oust directors due to misrepresentations in proxy solicitation statements for their election was moot because a new board had since been elected); *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 934 (3d Cir. 1992) (dismissing an equitable claim for new director elections as moot when an intervening, unchallenged election had taken place between the time the district court granted the motion to dismiss and the time the court of appeals decided the case); *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1389-90 (9th Cir. 1985) (finding that a declaratory claim challenging whether vacancies on a board of directors were properly filled was rendered moot by the subsequent election of a new board of directors); *Maldonado v. Flynn*, 597

F.2d 789, 797 n. 10 (2d Cir. 1979) (stating that the "terms of those elected in 1975 have expired, rendering moot the question of the validity of the election," but allowing the claim to continue as to later elections where the terms of the elected directors had not yet expired).

At the hearing on the Motion to Amend, Plaintiffs conceded that their request for a new director election is now moot, and they state in their Motion: "Given the passage of time, subsequent director elections, and the Internalization transaction in which AGNC purchased AGNC Manager, it would be exceedingly difficult and costly to 'unscramble the egg' through injunctive relief at this point." Mot. Am. at 4, ECF No. 115-1. Accordingly, to the extent that Plaintiffs seek to amend their Complaint to request a new director election, such amendment would be futile and will not be permitted.

## B. Damages

Plaintiffs also seek to amend their Section 14(a) claim to seek damages in the form of unjust compensation paid from 2014 to 2016 to the directors who were elected in connection with the Proxy Statements that allegedly violated Section 14(a). Their claim, however, remains futile because Plaintiffs do not demonstrate loss causation, as required for a Section 14(a) claim. Plaintiffs' proposed amendment also does not cure their failure to show transaction causation, as they still seek damages for a corporate transaction—namely, the payment of compensation to AGNC's directors—that was not put to a vote of the shareholders.

To assert a claim for a violation of Section 14(a), a plaintiff must show "that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction" that produced the injury. *Hayes v. Crown Cent. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (citing *Cathcart*, 980 F.2d at 932). The second and third elements have been

7

termed "loss causation" and "transaction causation," respectively. *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000); *Wilson v. Great Am. Indus.*, 979 F.2d 924, 931 (2d Cir. 1992).

Plaintiffs, in their efforts to cure their failure to demonstrate transaction causation in the First Amended Complaint, now plead a damages theory that fails to show loss causation. To satisfy the loss causation element at the pleading stage, a plaintiff must allege sufficient facts to support a conclusion "that the misrepresentations or omissions caused the economic harm" for which the plaintiff seeks relief. *See Grace*, 228 F.3d at 46-47. Where "[t]he typical remedy for elections of directors pursuant to materially misleading proxy statements is injunctive relief suspending or setting aside the tainted election," the only damages potentially available on such a claim are "out-of-pocket losses." *Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 192-93 (6th Cir. 1974) (holding that, where nullification of a director election was not possible because the corporation no longer existed, disgorgement of profits from the transaction was an inappropriate remedy and plaintiffs could seek only out-of-pocket damages).

In the proposed Second Amended Complaint, the only alleged financial harm asserted by Plaintiffs is the compensation paid to the directors. Such compensation, however, cannot fairly be deemed to be an economic harm or out-of-pocket loss to the company. In *Maldonado*, the United States Court of Appeals for the Second Circuit held that a Section 14(a) claim challenging director elections based on misleading proxy statements could proceed where the statements allegedly failed to disclose that amendments to a stock option plan financially benefited certain members of the board of directors at the expense of the company. *Maldonado*, 597 F.2d at 792, 797. The court remanded for a "determination whether the election of [the company's] directors should be nullified." *Id.* at 798. On remand, the district court rejected the plaintiff's attempt also to pursue damages in the form of the compensation paid to the directors, and thus to proceed to a jury trial,

because "compensation is an ordinary expense of a corporation payable to those who direct its affairs," such that "[e]ven had the directors, whose acts are under challenge, not been elected, others would have been functioning and fees would have been payable to them." *Maldonado v. Flynn*, 477 F. Supp. 1007, 1010 (S.D.N.Y. 1979).

This reasoning is persuasive and applicable. Here, the Proxy Statements themselves establish that AGNC had a standard compensation package for directors, including a standard annual rate, additional standard retainers for chairing certain committees, and a uniform stock award. There is no basis to conclude that director compensation was tailored to the specific individuals elected to the Board or was higher than usual for the members of the Board during the years in question, nor have Plaintiffs alleged as much in their proposed amendment. Thus, even drawing all inferences in favor of Plaintiffs at the pleading stage, the Court cannot infer that AGNC paid more in compensation to these directors than it would have had a different set of directors been elected. In turn, because the election of the directors in question did not cause any net reduction in company assets or earnings of the shareholders as a result of director compensation, the compensation paid to the directors was not an "economic harm" to the company or the shareholders caused by the director election. *See Grace*, 228 F.3d at 46-47; *Maldonado*, 477 F. Supp. at 1010; *cf. Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 388-89 (1970) (stating that in a Section 14(a) claim alleging misleading proxy statements relating to a proposed merger put to a shareholder vote, "monetary relief might be afforded to the shareholders only if the merger resulted in a reduction of the earnings or earnings potential of their holdings").

Notably, Plaintiffs have not identified any out-of-pocket costs to AGNC stemming directly from the challenged director election, such as the cost of issuing a new proxy solicitation, and likely cannot do so because, as discussed above, any claim that a new election should be held is

now moot. *See Ohio Drill & Tool Co.*, 498 F.2d at 192-93; *Maldonado*, 477 F. Supp. at 1009-10 (noting that costs of issuing a new proxy solicitation for a new director election could constitute out-of-pocket costs caused by false proxy statements). Accordingly, Plaintiffs' challenge to the director election fails because of the lack of sufficient factual allegations to establish loss causation.

For related reasons, Plaintiffs' Section 14(a) claim also fails for lack of transaction causation. When asked at the hearing about their theory of transaction causation, Plaintiffs noted that in challenges to director elections under Section 14(a), courts regularly find transaction causation because the transaction sought to be undone is the election itself. Plaintiffs are correct that "[f]or equitable and declaratory relief claims relating to the election of directors, . . . the causation approach presents problems." *Gaines v. Haughton*, 645 F.2d 761, 776 (9th Cir. 1981). Thus, "when the plaintiff-shareholder attacks only the election itself, instead of seeking money damages," courts focus their inquiry on the question of materiality. *Id.* Here, however, it is undisputed that equitable relief undoing the election is now moot. In seeking damages, therefore, Plaintiffs must show that the transaction voted upon resulted in the economic loss. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796-97 (11th Cir. 2010) ("*Goodman*"); *Cathcart*, 980 F.2d at 933. To the extent that Plaintiffs' allegations could establish loss causation, they would have to be construed as asserting that the amount or form of compensation to the directors exacted some specific damage to the company. At that point, however, the transaction causing the loss would be not the election of the directors, but the decision to approve the compensation package. It is undisputed that the Proxy Statements seek votes only on whom to elect to the AGNC Board, not on the specific amount or compensation package to be paid to them. Questions of director compensation, as a matter of AGNC policy, were left to the

discretion of the Compensation and Corporate Governance Committee, not the shareholders. Where the amount and form of director compensation was not put to a vote of the shareholders, the Proxy Statements were not an essential link to the accomplishment of that transaction. *See, e.g., Goodman*, 594 F.3d at 796-97. The real economic harm of which Plaintiffs complain is the alleged losses to AGNC from the repeated renewal of the Management Agreement, which, as discussed in the Court's previous Memorandum Opinion, was not put to a vote of the shareholders. *See In re AGNC Inv. Corp.*, 2018 WL 3239476, at *6.

In the end, the Court is unpersuaded that Plaintiffs' novel Section 14(a) claim is viable. Plaintiffs do not cite, nor has the Court identified, a single case where a court has found that a shareholder-plaintiff successfully stated a Section 14(a) claim challenging a director election where the economic loss was ordinary compensation paid to directors who engaged in activities that allegedly constituted a breach of fiduciary duty. The Court, mindful of the Supreme Court's caution against unduly federalizing state corporate law in such a fashion, *see Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977), cannot find that Plaintiffs' asserted chain of causation sufficiently states a Section 14(a) claim. Because the proposed Second Amended Complaint fails to state a viable Section 14(a), the Motion to Amend will be denied as to that claim.

## III.     Breach of Fiduciary Duty

In its Memorandum Opinion on Defendants' Motions to Dismiss, the Court dismissed Plaintiffs' claim that the Individual Defendants breached their fiduciary duty to AGNC by approving the Internalization because Plaintiffs had failed to establish that demand was futile as to that claim. Plaintiffs now argue that the proposed Second Amended Complaint demonstrates demand futility because:  (1) the new allegations establish that the directors upon whom demand would have been made faced a substantial likelihood of liability for breach of a fiduciary duty; and

11

(2) the new allegations demonstrate that the Board was not adequately informed and did not use a reasonable process in facilitating and approving the Internalization. The Court need not address the first argument because it finds that Plaintiffs have established demand futility under the second theory. The Court further finds that because Plaintiffs have now alleged sufficient facts to excuse demand as to the Internalization, they have necessarily satisfied the lower pleading standard for a Rule 12(b)(6) motion, rendering amendment proper.

### A.    Demand Futility

Federal Rule of Civil Procedure 23.1 requires that plaintiffs bringing shareholder derivative actions "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). This rule is known as the pre-suit demand requirement. Because AGNC is incorporated in Delaware, this Court turns to Delaware law to determine whether the Plaintiffs needed to make a pre-suit demand or whether such a demand would be futile, such that the requirement is waived. *See In re AGNC Inv. Corp.*, 2018 WL 3239476, at *6.

Under Delaware law, demand futility may be established by showing that there is a reasonable doubt either (1) that the directors are "disinterested and independent," or (2) that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). "[I]f either prong is satisfied, demand is excused." *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000). As for the second prong, implicated by Plaintiffs' argument that the directors were not sufficiently informed at the time that they approved the Internalization, a plaintiff may rebut the presumption that directors engaged in a valid exercise of business judgment

12

"by raising a reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation." *In re Walt Disney Co.*, 825 A.2d 275, 286 (Del. Ch. 2003).

### 1. Citations to the Delaware Action

The majority of Plaintiffs' allegations that AGNC's directors and officers were not adequately informed when they approved the Internalization are derived from an opinion by the Delaware Court of Chancery, attached to the proposed Second Amended Complaint, in which that court denied a motion to dismiss in a related shareholder derivative action brought against the same Individual Defendants, with the exception of Federico who is not named in the Delaware action, and alleging the same breach of fiduciary duty. *See H & N Mgmt. Grp., Inc. v. Couch*, No. CV 12847-VCMR, 2017 WL 3500245 (Del. Ch. Aug. 1, 2017) ("the Delaware Action"). Where Plaintiffs quote broad swaths of that opinion in their proposed Second Amended Complaint, Defendants argue that such importation of facts from the Delaware Action is impermissible because Plaintiffs did not conduct a books and records inspection pursuant to Del. Code Ann. tit. 8, § 220 (West 2006) ("Section 220") and therefore cannot "rid[e] the coattails of a separate, duplicative action." Indiv. Def. Opp'n Mot. Am. at 18-19 n. 9, ECF No. 122.

There is, however, no rule against quoting from another opinion in a pleading, a point which Defendants conceded at the hearing on the pending Motion. The factual allegations in a complaint must "have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Thus, factual allegations must be supported by some "information obtained prior to filing," but there is no rule against obtaining that information from filings in a related action. *Morris v. Wachovia Sec. Inc.*, 448 F.3d 268, 277 (4th Cir. 2006); *see also I.B. Trading, Inc. v.*

*Tripoint Global Equities, LLC*, 280 F. Supp. 3d 524, 546 (S.D.N.Y. 2017) (denying a motion to strike allegations derived from a complaint in a related civil action, and holding that the allegations "are relevant because they closely parallel those at issue in this case against the same defendants . . . revolving around the same alleged Ponzi scheme," so they "provide some basis for the plaintiffs' allegations in this case").

The case law relied upon by the Individual Defendants in arguing that this Court must disregard the allegations drawn from the opinion in the Delaware Action is unpersuasive. In *Lipsky v. Commonwealth United Corporation*, 551 F.2d 887 (2d Cir. 1976), the Second Circuit affirmed the striking of an exogenous complaint because the case in which the complaint had been filed resulted in a consent decree, which is not an adjudication on the merits. *Id.* at 892-94. Several district courts within that circuit, relying on *Lipsky*, have stricken portions of a complaint taken from complaints in other actions where there had yet to be an adjudication on the merits. *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403-04 (S.D.N.Y. 2009) (striking citations to complaints in other actions that had not been adjudicated on the merits); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 79 (S.D.N.Y. 2003) (same); *see also In re CRM Holding, Ltd. Securities* Litigation, No. 10 CIV. 975 RPP, 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) (holding that the plaintiffs' citations to "unproven allegations" in a different complaint did not constitute plausible factual allegations because there had been no ruling on the merits in the other case). In other cases, however, district courts have declined to read *Lipsky* so broadly. *See, e.g.*, *VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11 CIV. 6805 DLC, 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013) (denying a motion to strike and stating "[a] close reading of *Lipsky* reveals that it does not mandate the elimination of material from a complaint simply because the material is copied from another complaint."). Defendants have identified no

controlling authority barring consideration of allegations derived from a complaint in another case, and the Court declines to adopt such a rule that appears to be inconsistent with the standard for pleadings under Rule 11(b)(3). Moreover, Plaintiffs rely not simply on a complaint, but on the Court of Chancery's opinion on the motion to dismiss in the Delaware Action in which that court, while accepting the facts from the complaint as true for purposes of the Motion, deemed them sufficiently well-pleaded to state a plausible claim for relief.

Contrary to Defendants' view, there also is no special rule barring shareholder derivative action plaintiffs who did not first review the books and records of the corporation pursuant to Section 220 from borrowing allegations from another case in which the plaintiffs did conduct a Section 220 review. The primary case relied upon by the Individual Defendants for this argument, *White v. Panic*, 783 A.2d 543 (Del. 2001), does not stand for this proposition. In *White*, the plaintiffs' complaint relied heavily on allegations taken from a *U.S. News & World Report* article. *Id.* at 547. On a motion to dismiss, the Delaware Supreme Court considered the allegations in the complaint which had been taken from the article, but it held that even considering these allegations, the plaintiffs still failed to state a claim. *Id.* at 547-50. In denying the plaintiffs leave to amend after affirming dismissal of their claims, the court chastised the plaintiffs for not conducting a books and records investigation prior to filing suit, and declined to permit them to go back and do what they could have done initially, but did not conclude that all plaintiffs are required to conduct a Section 220 investigation prior to filing suit, particularly if they are able to state a claim without doing so. *Id.* at 550, 556-57.

Indeed, the Delaware Supreme Court effectively rejected Defendants' argument a decade later in *Pyott v. Louisiana Municipal Police Employees' Retirement System*, 74 A.3d 612 (Del. 2013), where the court declined to adopt an irrebuttable presumption that a "fast-filing

stockholder" who files suit without a conducting a Section 220 books and records action is an inadequate representative. *Id.* at 618. The court acknowledged that a Section 220 investigation can be a helpful tool for plaintiffs, but it found no requirement that plaintiffs must file a Section 220 action and review the corporation's books and records before filing a complaint. *Id.* Accordingly, where there is no reason to believe that the allegations derived from the Delaware Action lack evidentiary support or are not based on information acquired by the Plaintiffs, Fed. R. Civ. P. 11(b)(3), the Court finds no barrier to considering those allegations for purposes of the Motion.

### 2.    Inadequately Informed Directors

Plaintiffs' new allegations raise "reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation," such that demand futility has been properly alleged. *In re Walt Disney Co.*, 825 A.2d at 286. The standard for determining "whether a business judgment reached by a board of directors was an informed one is gross negligence." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989). The inquiry focuses on the board's decision-making process, and courts should look for "evidence as to whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives." *Id.*

Here, Plaintiffs have adequately alleged that the AGNC directors, in approving the Internalization, failed to obtain relevant information that should have been considered, did not fully consider alternatives to the Internalization that would have been significantly more economical for AGNC, and allowed Kain to dominate the board's deliberations and dictate their ultimate decision. As this Court has already held, Kain was plainly conflicted at the time of the Internalization because he stood to lose his salary from AGNC Manager and MTGE Manager in

16

the event that the Internalization did not occur and the Management Agreement was instead terminated. *See In re AGNC Inv. Corp.*, 2018 WL 3239476 at \*8. The Internalization was ultimately completed in accordance with Kain's recommendations in a period of less than two months.

Plaintiffs' new allegations state that on November 25, 2015, American Capital, the parent company of AGNC Manager, announced that it was conducting a "full strategic review all of all alternatives" to its management arrangement, including a possible sale, to maximize shareholder value. SAC ¶¶ 81, 91, ECF No. 115-2. In response to this announcement, the AGNC Board and the MTGE Board collectively formed a Joint Committee of independent directors to act on behalf of both companies, comprised of Defendants Couch, Davis, Dobbs, Harvey, and Larocca. The Joint Committee met for the first time on March 6, 2016, and the minutes from that meeting stated that "no significant information had been provided by American Capital or its advisors . . . despite multiple requests that had been made by individual directors and their attorneys." SAC ¶ 104. On March 9, 2016, the Joint Committee met again, and according to the minutes for that meeting, an "American Capital special committee member wanted to give information to the Joint Committee" but "Wilkus had prevented him from providing more information to [AGNC and MTGE] about the American Capital strategic review process." *Id.*

Then, at meetings on March 15 and 16, 2016, Kain, who was not a member of the Joint Committee, presumably due to his conflicts of interest, repeatedly expressed his preference for the Internalization and stated that he "had received instructions to pursue the internalization of the managers with the funds." SAC ¶¶ 104-05. The following day, on March 17, 2016, Kain was appointed Chief Executive Officer ("CEO"), Chief Information Officer, President, and a director of AGNC and MTGE, while continuing to serve as President of AGNC Manager. At subsequent

meetings on March 23, 25, and 30, 2016, a Joint Committee member conveyed Kain's strong desire

for the Internalization, and an independent advisor from J.P. Morgan proposed that Kain conduct

an analysis of the Internalization, refine the analysis with J.P. Morgan, and then present it to the

independent directors of AGNC and MTGE. The Joint Committee approved that proposal and

directed that Kain work with J.P. Morgan to put together an internalization proposal.

On April 10, 2016, J.P. Morgan and the law firm Jones Day, which had been hired as

financial and legal advisors to the Joint Committee by the directors of AGNC and MTGE, outlined

four options for internalization: (1) joint acquisition of AGNC Manager by AGNC and MTGE,

(2) sole acquisition of AGNC Manager by AGNC, which would then externally manage MTGE,

(3) sole acquisition of AGNC Manager by AGNC and the liquidation of MTGE, and (4) liquidation

of both AGNC and MTGE. Although the Joint Committee initially deferred deciding which

avenue to pursue, just 24 hours later, the Joint Committee decided to pursue the Internalization.

The proposed Second Amended Complaint then details Kain's role in advising the Joint

Committee on an appropriate purchase price for ACMM and the appropriate transaction structure

for the Internalization. In less than two months, on July 1, 2016, the Internalization was completed

in accordance with Kain's recommendations. The proposed Second Amendment Complaint

alleges that the Joint Committee "was fully aware of Kain's conflict," knew that "the investment

banker's analysis was prepared 'at the direction' of Kain," but "allowed him to dominate their

process, dictate the transaction structure, and direct the ultimate deal terms." SAC ¶¶ 117-118. It

further asserts that "[w]ithout developing adequate information from independent sources to make

a fully and fairly informed decision, the Board followed defendant Kain and his conflicted legal

and financial advisors at every step of the process of structuring the Internalization and the key

deal terms before the rump Board's formal vote approving the deal, and then merely rubber-stamped the Kain-led Internalization." SAC ¶ 120.

These new allegations, viewed in the light most favorable to Plaintiffs, provide reason to believe that the Board of AGNC acted with gross negligence when it approved the Internalization. The Board allowed Kain to dominate its deliberation process, even though it knew of his conflicts, and the Board acted without receiving relevant information it had requested, failed to pursue that information, and turned a blind eye to alternatives proposed by its experts from J.P. Morgan. *See Brehm*, 746 A.2d at 262 (stating that when an expert advises a board of directors, the directors breach their fiduciary duties where they do not rely on the expert, their reliance on the expert was not in good faith, or where the alternative that the board fails to consider was so obvious that even without the expert's advice, it should have been considered). Here, Plaintiffs have sufficiently alleged that based on figures in a June 1, 2016 presentation to the United States Securities and Exchange Commission, the AGNC Board was aware of the potential cost savings of terminating the Management Agreement and bringing management in-house instead of purchasing ACMM through the Internalization but failed to give this alternative, and others, due consideration. Instead, as alleged in the proposed Second Amended Complaint, they pushed their experts to consult with Kain, a conflicted fiduciary, and then relied blindly on Kain's recommendations.

As the court in the Delaware Action noted, the Delaware Court of Chancery was presented with similar facts in *McPadden v. Sidhu*, 964 A.2d 1262 (Del. Ch. 2008), in which the court found demand to be futile. *Id.* at 1270-73. In *McPadden*, the board of directors allowed a conflicted manager, whose affiliate ended up buying the company's subsidiary, to lead the sales process with minimal opposition and oversight. *Id.* After examining the series of discrete board actions leading up to the sale and the role of the conflicted manager in each of those actions, the court found that

19

the board's reliance on the conflicted manager and failure to consider obvious alternatives was sufficient to constitute gross negligence that would excuse demand. *Id.* at 1271. Likewise, Plaintiffs' allegations that the AGNC Board allowed Kain, a conflicted director, to dominate the consideration of the Internalization and thus failed to consider alternatives are sufficient to create reasonable doubt that the board's approval of the Internalization was the product of an adequately-informed, valid exercise of business judgment. Accordingly, the Court, viewing the allegations in the light most favorable to Plaintiffs, concludes that Plaintiffs' Second Amended Complaint sufficiently establishes demand futility as to the breach of fiduciary duty claim relating to the Internalization.

### B.     Failure to State Claim

Because Plaintiffs have alleged sufficient facts to excuse demand as to the Internalization, they have necessarily satisfied the lower pleading standard for a Rule 12(b)(6) motion, which is the relevant test for determining whether amendment would be futile in this case. *See McPadden*, 964 A.2d at 1270; *HCMF Corp.*, 238 F.3d at 276-77. As detailed above, the Court finds that the proposed Second Amended Complaint sufficiently alleges that the Individual Defendants acted with gross negligence as to their duties as directors. *See Aronson*, 473 A.2d at 812. Accordingly, the allegations sufficiently state a claim that they are liable for breach of fiduciary duty. The Motion will be granted as to the breach of fiduciary claim relating to the Internalization.

### IV.    Aiding and Abetting

Plaintiffs' proposed Second Amended Complaint again alleges that Defendant ACAM aided and abetted the Individual Defendants in the breach of their fiduciary duty when they approved the Internalization. In resolving ACAM's Motion to Dismiss, the Court previously dismissed Plaintiffs' claim against ACAM because if "demand was not futile for Plaintiffs' breach-

of-fiduciary-duty claim as it relates to the Internalization, the requirement of demand futility would not be met for this accompanying aiding-and-abetting claim." *In re AGNC Inv. Corp.*, 2018 WL 3239476 at *10. Where the Court has now found that Plaintiffs' proposed Second Amended Complaint satisfies the demand futility requirement as to the Internalization, the Court must assess whether the new facts alleged by Plaintiffs support the requisite scienter by ACAM to state a claim for aiding and abetting a breach of fiduciary duty.

As this Court previously concluded, Delaware law governs Plaintiffs' claim against ACAM. *See id.* at *11. Under Delaware law, the elements of a claim for aiding and abetting a breach of a fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Gotham P'rs, P.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002). Notably, a defendant must "act with the knowledge that the conduct advocated or assisted constitutes" a breach of fiduciary duty. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). Knowing participation in a breach of the fiduciary duty of care is established if "the third party knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating the informational vacuum." *In re Rural Metro Corp.*, 88 A.3d 54, 97 (Del. Ch. 2014); *see also id.* at 99 (noting that a third party may be liable for aiding and abetting a breach of the duty of care).

The Court previously found that the First Amended Complaint provided no allegations that ACAM had knowledge that the Internalization constituted a breach of fiduciary duty by the Individual Defendants. *In re AGNC Inv. Corp.*, 2018 WL 3239476, at *11. The Court stated:

> For example, while Plaintiffs allege that Defendants Wilkus, Erickson, and Flax were all officers of ACAM at the time of the Internalization, there are no allegations

21

> that these Defendants knew that the terms of the Internalization were sufficiently
> adverse to AGNC that its approval on behalf of AGNC would constitute a breach
> of fiduciary duty. Merely alleging that ACAM entered into the Internalization
> agreement is insufficient to state an aiding-and-abetting claim.

*Id.* However, in the proposed Second Amended Complaint, Plaintiffs have alleged additional facts

that demonstrate that at least Wilkus, who was an officer and director of ACAM at the time of the

Internalization and in the months of deliberations leading up to the Internalization, had knowledge

that the terms of the Internalization were sufficiently adverse to AGNC that their approval could

constitute a breach of fiduciary duty and assisted such a breach by affirmatively preventing the

AGNC Board from obtaining necessary information related to the Internalization.

Up through mid-March 2016, Wilkus held positions, as relevant here, as the CEO of

American Capital; President and CEO of ACAM; CEO of ACMM; CEO of AGNC Manager;

Chairman, Director, and CEO of both AGNC and MTGE; and CEO of MTGE Manager. On March

17, 2016, Wilkus resigned as the CEO and a director of both AGNC and MTGE. Thus, at the time

of the Internalization vote on May 23, 2016, Wilkus was on neither the AGNC Board nor the

MTGE Board but remained President of ACAM. Today, Wilkus continues to serve as President

of ACAM and CEO and Chairman of American Capital.

ACAM stood to benefit from a high price-tag on the sale of ACMM through the

Internalization because ACMM was ACAM's wholly-owned subsidiary. Based on his role as an

officer of American Capital, ACAM, and ACMM, Wilkus also stood to benefit from a high-priced

sale of ACMM. As alleged in the proposed Second Amended Complaint, Wilkus was an active

participant in many of the Joint Committee's deliberations, particularly before March 17, 2016,

and not only was aware of the Internalization's possible adverse impact on AGNC, but also took

affirmative steps to prevent AGNC's board from obtaining information about the transaction.

Specifically, the proposed Second Amended Complaint alleges that on March 9, 2016, an

22

American Capital special committee member wanted to give additional information to the Joint Committee, but Wilkus prevented him from doing so. Where his actions could reasonably be inferred to have been taken on behalf of ACAM as well as American Capital, Wilkus's actions and knowledge of the Internalization's impact on AGNC are imputable to ACAM. *See Teachers' Ret. Sys. of Louisiana v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) (stating that "it is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation"); *see also CompoSecure, L.L.C. v. CardUX, LLC*, No. 177, 2018, 2018 WL 5816740, at *12 (Del. Nov. 7, 2018) (citing *Aidinoff* and finding that knowledge of the agent of an LLC within the scope of the agency relationship is imputed to the LLC).

Plaintiffs further allege that when the AGNC Board hired advisors to assist their review of the proposed Internalization, "Wilkus and [] Flax were surprised and upset at the funds' initiating their own process." SAC ¶ 176. They also assert that Wilkus and American Capital directed American Capital's advisors to issue threats to AGNC that if it did not work with American Capital on the Internalization process, "the Funds would be treated as a counterparty and no information would be provided to the Funds about the [American Capital] strategic review process until such time that the consent of the independent directors is requested to approve the potential purchaser." SAC ¶ 176.

At the hearing on the Motion, ACAM argued that any information that Wilkus kept from the Joint Committee relating to American Capital's strategic review process was proprietary and appropriately withheld from AGNC because AGNC was a potential bidder for the purchase of ACMM and thus a counterparty to American Capital and ACAM. However, this claim apparently relies on facts outside the complaint, which are not appropriately considered at the pleading stage, and is inconsistent with the allegations, which support the inference that the strategic review

23

information was withheld as part of an effort by Wilkus and others to induce AGNC to approve the Internalization. Indeed, the allegations in paragraph 176 of the proposed Second Amended Complaint make clear that, at least at the time that the information was withheld, AGNC was not being treated as a counterparty, and that it would only be viewed as such if the AGNC Board did not cooperate in the Internalization. Where the Court's analysis is limited to the allegations in the complaint, and those allegations must be viewed in the light most favorable to the Plaintiffs, the Court finds sufficient facts alleged to show that Wilkus, on behalf of ACAM, knowingly acted to assist a breach of fiduciary duty by depriving members of the AGNC Board of relevant information.

ACAM asserts that only individuals or entities in a position of trust, not transaction counterparties, can aid and abet a breach of the fiduciary duty of care. *See, e.g., In re Rural Metro*, 88 A.3d at 99-100 (noting that a claim for aiding and abetting a breach of fiduciary duty can arises when a "third party, for improper motives of its own, misleads the directors into breaching their duty of care," such as when an advisor had a conflict of interest and failed to disclose relevant information to further its own opportunity); *In re Comverge, Inc.*, No. CV 7368-VCP, 2014 WL 6686570, at *19 (Del. Ch. Nov. 25, 2014) (finding no viable aiding-and-abetting claim absent an abuse of trust relating to corporate fiduciaries). Such a limitation, however, applies only when the defendant is a counterparty in an arm's-length transaction. *See Malpiede*, 780 A.2d at 1096-97 ("[A] bidder's attempts to reduce the sale price through arm's-length negotiation cannot give rise to liability for aiding and abetting, whereas a bidder may be liable . . . if the bidder attempts to create or exploit conflicts of interest in the board."). Here, Plaintiffs have alleged sufficient facts to conclude that the Internalization was not an arm's-length transaction, and that American Capital, ACAM, and Wilkus were supposed to have been working jointly with AGNC to arrange the terms

of the Internalization, but abused that trust. Moreover, Wilkus was on both the ACAM and AGNC Boards, such that ACAM arguably was exploiting conflicts of interest among directors when Wilkus prevented AGNC directors from receiving relevant, requested information while he simultaneously owed duties to both ACAM and AGNC.

The facts alleged do not draw a clear line between Wilkus's actions and his role with ACAM, as opposed to his other roles within the American Capital corporate structure, such that the evidence supporting this claim will be subject to careful scrutiny at a later stage of the case. Nevertheless, drawing all inferences in favor of Plaintiffs at the pleading stage, the Court concludes that the allegations are sufficient to state a claim that ACAM, through Wilkus, knowingly aided and abetted the AGNC Board in a breach of fiduciary duty by creating an "informational vacuum" under which the AGNC directors approved the Internalization. *In re Rural Metro Corp.*, 88 A.3d at 97. The Court will therefore grant the Motion as to the amendment to the claim of aiding and abetting a breach of fiduciary duty.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Amend is GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the breach of fiduciary duty and aiding-and-abetting a breach of fiduciary duty claims, which the Court finds to be adequately pleaded, and will be denied as to the Section 14(a) claim. A separate Order shall issue.


Date: February 6, 2019

THEODORE D. CHUANG
United States District Judge